# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00829-SCT

*IN THE MATTER OF THE ESTATE OF JAMES OLDRUM SMITH, JR., DECEASED: LELA SMITH FLOWERS, CHRISTOPHER STANTON SMITH, AND CHRISTY NOAH AS ADMINISTRATOR OF THE ESTATE OF JINX P. SMITH, JR.*

*v.*

*TODD A. BOOLOS AS SUCCESSOR TRUSTEE OF THE J.O. SMITH, JR., FAMILY TRUST, PATRICK RAYMOND SMITH, ERNEST LANE, III, TRUSTMARK NATIONAL BANK, BIG RIVER SHIPBUILDERS, INC., YAZOO RIVER TOWING, INC., STEVE SESSUMS, AND VICKSBURG PLANT FOOD, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/12/2014 |
| TRIAL JUDGE: | HON. HOLLIS McGEHEE |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | DAVID M. SESSUMS |
| | PATRICIA PETERSON SMITH |
| ATTORNEYS FOR APPELLEES: | A. SPENCER GILBERT, III |
| | DAVID RYAN LYNCH |
| | LAWRENCE MATTHEW QUINLIVAN |
| | JUDY LYNN BURNTHORN |
| | WILLIAM F. RAY |
| | STEPHANIE M. RIPPEE |
| | LISA ANDERSON REPPETO |
| | FRANK G. VOLLOR |
| | KAYTIE MICHELLE PICKETT |
| | LINDSAY THOMAS DOWDLE |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED AND REMANDED - 09/01/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., COLEMAN AND BEAM, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.	James Oldrum Smith Jr. (Father) died on August 24, 2006. The present appeal stems from his adult children's discord over the handling of Father's estate (Estate), and, as is common in estate cases, the children's discord over the Estate has resulted in lengthy litigation. The Estate is complicated by the fact that, prior to his death, Father created a family trust (Trust); however, he died within three years from the creation of the Trust. Father's death within three years meant that the money in the Trust became taxable to the Estate, leaving the Estate otherwise unable to pay its taxes due to liquidity issues. Therefore, the Estate borrowed $2,020,000 from the Trust, secured by a promissory note and deed of trust, to help pay the taxes. Some of the siblings, who would receive a greater amount of money from the Trust than from the Estate, later took issue with the loan, specifically that the amount now owed on the loan was much greater than what the other siblings, the trustee, and the co-executors claimed. As a result, the aggrieved siblings filed several actions challenging the trustees' and the co-executors' decisions, particularly as related to the loan between the Trust and the Estate. The special chancellor appointed to the case determined that the trustees and co-executors did not breach any duty owed to the beneficiaries and that the loan was valid in the amount of $2,523,004.83 plus four percent interest per annum. The present appeal is the result of the chancellor's judgment, and finding no error, we affirm. We also grant Steve Sessums's motion for appellate attorneys' fees and costs, remand for the

2

chancery court to determine the appropriate amount owed, and for the chancery court to enter a judgment for that amount.

## FACTS AND PROCEDURAL HISTORY

¶2. The instant case is not a traditional estate case in the sense that the judgment below does not address a challenge to or the distribution of a will. Instead, the judgment narrowly addressed the actions of the co-executors and the trustees and the validity and amount of one loan. Due to the number of parties involved, we provide a brief synopsis of the parties to the action and their relations to one another. Father had four children: Lela Smith Flowers, James Oldrum Smith, III (J.O.), Jinx Smith, and Patrick Smith. Jinx predeceased Father but had three surviving children that are a part of the case: Jinx Smith Jr., Christopher Stanton Smith, and Patricia Stafford Smith. Jinx Jr. died in 2012, but his estate is a party through his mother Christy Noah. Noah also is Christopher's mother; therefore, with regard to Jinx Jr.'s and Christopher's interests and actions throughout the case, and will be referred to cumulatively as Noah. Patricia and her mother Lyn Smith are not a party to the appeal but collectively will be referred to as Lyn. Also of interest is that Father's ex-wife Petesy Smith represented Lyn in the litigation; however Petesy represents Noah on appeal. Petesy is the mother of the adult children. To summarize, the family members involved in the appeal are: Lela, J.O., Noah (as representative of Jinx Jr. and Christopher), and Patrick. Again, Lyn is not a party to the appeal.

¶3. The nonfamily parties are: Trustmark National Bank and Ernest Lane III, original co-executors of the Estate; Steve Sessums, trustee of the Trust at the time of Father's death;

3

Todd Boolos, successor trustee of the Trust; and Big River Shipbuilders, Yazoo River Towing, Inc., and Vicksburg Plant Food, Inc., three of the family/Estate-owned companies.

¶4. Prior to his death, Father executed a will and three codicils. Pursuant to his will, each of his children would receive an equal share of Father's estate. However, the third codicil to Father's will left J.O. forty-one percent of Father's shares in Big River Shipbuilders, Yazoo River Towing, and Vicksburg Plant Food. Lela and Patrick were to receive, equally, the remaining thirty-nine percent of Father's shares in Big River Shipbuilders and Vicksburg Plant Food and twenty-nine percent of his Yazoo River Towing shares.[1] Then, in December 2003, Father created the Trust, funded by life insurance policies, in which each of the children received equal shares of the funds. According to the testimony of Steve Sessums, the Trust's original trustee[2] and the Trust's and Estate's certified public accountant (CPA), if Father had lived for three years following the creation of the Trust, the life insurance proceeds would have been excluded from Father's Estate; however, Father did not live three years. Therefore, though the Trust assets remained in the Trust and unlikely would be subject to an IRS lien, the value of the assets was included in the calculation of the Estate's taxes. After Father's death, Sessums contacted Ernest Lane and Trustmark, the co-executors of the Estate, and all three began to gather Father's assets– approximately $16 million– and

---

[1] The percentages are taken directly from the codicil at issue. The fact that the codicil does not appear to account for a full one-hundred percent of Father's stock in the companies is unexplained.

[2] Todd Boolos initially was the trustee; however, when he left the company in 2004, Sessums was appointed trustee until Father's death. Boolos later replaced Sessums as trustee.

4

prepare the tax return. Additionally, Sessums, Lane, and Trustmark hired James K. Dossett, a tax attorney, to help advise them on handling the Estate and Trust. The estimated tax liability for the Estate, including the Trust, was approximately $6 million.

¶5. According to Sessums, the Estate did not have many liquid assets with which to pay the estate taxes. The bulk of the Estate was real estate and stock in the Estate/family-owned companies, which was not easily liquidated. The Trust paid approximately $1,180,000 for its portion of the Estate's taxes and loaned the Estate an additional $2,020,000 to help the Estate pay the taxes. The loan was secured by promissory notes and deeds of trust that listed the collateral as real estate owned by the Estate with an appraisal value of close to $2,500,000. Sessums admitted that the loan was made without prior court approval but said that he had told Bill Shappley, an attorney who handled the loan transaction by preparing the promissory note and deeds of trust, to coordinate obtaining any necessary court orders with Lane.

¶6. Sessums testified that a justification for the loan was that the alternative was to have an Internal Revenue Service (IRS) lien on all of the assets, and no other source of liquid assets was available to the Estate. Dossett's testimony was consistent with Sessums's testimony that it was "common and prudent for the life insurance trust to loan money to the estate to pay the taxes[, and it] would be a common prudent action of the trustee to loan the money." Additionally, Sessums explained: "I felt like it was better if the [T]rust was the creditor versus the IRS being the creditor. . . . [T]he cash in the [T]rust was going to the IRS one way or the other. . . . I wanted to be a secured creditor versus an unsecured creditor."

5

Also according to Sessums, an IRS lien was less desirable than the loan because the lien would affect the Estate/family-owned companies' abilities to operate. Dossett testified that the IRS has a provision that would allow deferment of a portion of the taxes and installment payments made; however, the process of deferring and implementing the installment payments was less desirable because it was a very difficult process and included liens on the Estate's assets. Further, installment payments would prevent the closing of the Estate until all payments had been made, and being on the installment-payment option makes it difficult to get approval to distribute Estate assets/income. Dossett also testified that it was unlikely that the IRS could seize or put a lien on the Trust's assets.

¶7. A year passed and by May 2008, the Estate had not made any payments on the loan, nor were any quarterly interest payments made. Sessums testified that the Estate did not have the liquidity to pay the note. Sessums requested that Shappley prepare another one-year promissory note. The difference between the original note and the renewal note was that simple interest at 8.25% for one year was added to the total for a new total of $2,186,650. The interest rate on the renewal note changed from 8.25% to 5%. Sessums testified that the 5% interest rate was fair to both the Trust and the Estate at the time. The renewal, though dated May 23, 2008, but not actually signed until 2009, extended the maturity date until May 2009. The loan was renewed again in May 2009 with the total, including simple interest, of $2,295,982.50.

¶8.     In January 2009, the Trust then advanced the Estate another $60,000, and another $50,000 in January 2010 to pay taxes. The advances were not rolled into the balance of the note based on the first and second renewals.

¶9.     Around late 2010 or early 2011 things begin to get interesting for the Estate and the Trust. Sessums made a claim that the deed of trust from the original loan needed to be renewed, or alternatively, that the property be foreclosed due to the running of a three-year statute of limitations. However, in March 2011, the siblings removed Sessums as trustee and appointed Boolos as successor trustee. Sessums took no further action on behalf of the Trust after his removal. The chancery court entered an order on March 30, 2011, authorizing the Estate to borrow money from the Trust to pay income taxes and ongoing administrative fees and expenses. Specifically, the order contained the following language: "The Co-Executors are authorized and directed to execute all such notes and deeds of trust, extensions and renewals thereof as are requested by the J.O. Smith Jr. Family Trust to renew and extend the maturity of the existing indebtedness of the Estate . . . ." Following the chancery court's March 30, 2011, order, the co-executors carried out the third renewal and extension of the promissory note. The third renewal provided that the principal sum owed, including interest, was $2,326,636.69, with four percent interest per annum.

¶10.     On April 12, 2012, Lela's attorney sent a letter to Boolos concerning the Trust's loan and the amount owed by the Estate, and lodging her objection to the upcoming fourth renewal of the loan. According to Boolos, Lela told him that his calculations on the amount owed on the loan were incorrect because a penalty provision and interest made the amount

7

owed several million dollars more than Boolos's calculation. Attached to the letter was a spreadsheet containing Lela's calculations of the amount owed, including penalties and interest–$5,809,544.78.[3] After Lela presented her calculations and retained an attorney, Boolos also hired an attorney. Boolos and the Trust beneficiaries met to discuss the loan balance, and Boolos determined that a consensus about the loan could not be reached absent court intervention.

¶11. As a result, Boolos filed a petition for declaratory relief in the Warren County Chancery Court asking the chancery court to: 1. determine the validity of the promissory note and deed of trust; 2. determine the prudence of the original trustee and successor trustee's actions; 3. reform the deed of trust to reflect a correct property description and remove a late payment provision; and 4. allow payments of administrative claims against the Trust. Ultimately Boolos amended the petition for declaratory relief twice, with the final petition filed in January 2013. Boolos's final petition requested the chancery court enter declaratory relief in favor of the Trust, finding that the principal owed, based on the calculation of the third renewal, was $2,326,636.69 with annual compounding interest, and that the making of the initial loan and subsequent renewals was not a breach of his or Sessums's fiduciary duties. Additionally, Boolos requested that the chancery court reform the deed of trust to remove a late payment provision– a provision which served as a basis for Lela's calculations– that was not contained in the promissory note and, according to Boolos and Sessums, was included as an oversight and originally had not been contemplated by the

---

[3]She later testified that as of May 23, 2013, the amount owed was $7,013,099.43.

8

parties. Boolos also claimed there was an error in a property description in the deed of trust whereby only a half interest instead of a full interest was conveyed as collateral.

¶12. When Lela filed her answer to Boolos's original petition for declaratory relief, she also filed a motion requesting that the Boolos be removed as trustee due to her belief that Boolos's petition for declaratory relief took a position "directly contrary to the best financial welfare and interests of the [Trust]." Lela's motion, filed in September 2012, further claimed that Boolos had breached his fiduciary duties by asserting a position contrary to the best interest of the Trust. Noah and Lyn also filed answers to the petition for declaratory relief and both joined in Lela's motion to remove Boolos. Lela filed a second motion to remove Boolos in February 2013, alleging that Boolos should be removed due to his "numerous conflicts of interests" and that he should "disgorge all feeds paid to himself" as well as all fees paid to attorneys by Boolos from Trust assets.

¶13. Also around the same time that Lela filed her answer to Boolos's original petition for declaratory relief and her 2012 motion to remove Boolos, Lela filed a motion to examine the corporate books and records of Big River, Yazoo River Towing, and Vicksburg Plant Food. She filed a motion requesting the chancery court restrict the companies from paying bonuses, purchasing new equipment, and any other unnecessary expenses. Finally, Lela filed a motion to compel the Estate's executor to collect past-due and present rent on properties owned by the Estate and used by family members or the family companies. Alternatively, Lela asked that the chancery court remove Lane as the executor for his failure to collect any rent on several properties owned by the Estate.

¶14. After Lela's motion to review the corporate books and records, the companies, through their attorney, requested that Lela explain how the demand was "reasonably related to the performance of the director's duties as a director . . . but not for any other purpose" pursuant to Mississippi Code Section 79-4-16.05 and asked that Lela specify documents she was requesting. Lela's response, also through her attorney, was that as a director, she was responsible/liable for the affairs of each company and any possible mismanagement, which she suspected was going on in the companies. Lela's response also recognized that "Lela has an obvious person[al] reason to want to view the books and records . . . but that does not diminish her legal right as a director to do so." Additionally, Lela reiterated that her request was for "**all**" of the books and records of the companies. By April 2013, the other members of the companies' boards of directors voted to remove Lela from the boards. Later the same month, the companies formally responded to Lela's motion to examine company books and records by requesting that the chancery court deny Lela's motion, or alternatively, require Lela to state which specific documents she wanted and the purpose for which she sought the documents.

¶15. At a May 2, 2013, hearing, the chancery court found that Lela had failed to "demonstrate with any specificity at all, or even in a general sense, the basis for [her] request." However, the chancery court ultimately held that the companies should produce the documents to be held and sealed with the chancery court so that if Lela ever demonstrated a need related to her duties as a director, the records would be preserved and available. Then, in November 2013, the chancery court *sua sponte* reversed its May 2, 2013, ruling and

10

allowed Lela and Noah to have access to the records, which were stored on a zip drive, with an understanding that the data should not be disclosed to a nonparty. The documents on the zip drive were stored in the Peachtree[4] program format that Lela and Noah allegedly had difficulty accessing; therefore, the companies ultimately provided hard copies of the requested documents and the zip drive was returned to the companies. Later, the companies discovered that Lela had copies of two of the three companies' Peachtree documents from the zip drive, so they filed a motion for protective order.

¶16. Though Trustmark resigned as co-executor in June 13, 2011, it remained involved in the litigation and, on April 30, 2013, Trustmark filed its final accounting of the Estate. Lane supplemented Trustmark's accounting on May 1, 2013. Several parties objected to the accountings, and the chancery court held hearings on the objections. After filing its accounting, Trustmark again asked to resign as co-executor; Lane also filed notice to resign as co-executor. The chancery court accepted Lane's and Trustmark's resignations, and it appointed Ken Lefoldt as the sole administrator of the Estate/trustee of the testamentary trusts in the Estate for the minor beneficiaries.

¶17. After at least thirteen hearings spanning three years and several judgments entered, the chancery court entered its Mississippi Rule of Civil Procedure 54(b) final judgment on March 21, 2014, and an amended judgment on July 18, 2014. The final judgment

---

[4] "Peachtree is the accounting and business system software package used by the . . . companies. Data is input and retained in the Peachtree program until a user directs the program to run reports. . . . The Peachtree back-up files copied to the zip drive under seal contained all the raw data of the . . . companies, including the confidential information of employees and customers as well as the proprietary information of the . . . companies."

11

incorporated several of the chancery court's previous rulings, particularly its May 8, 2013, ruling that the promissory note was a valid obligation of the Estate with a total indebtedness of $2,523,004.83 plus interest at four percent per annum. Additionally, the chancery court incorporated its March 10, 2014, judgment which reformed the legal description of a piece of property pledged as collateral on the loan that included only a half interest to reflect that the whole interest was pledged.

¶18. The chancery court also entered its sixty-page findings of fact and conclusions of law. It made the following findings:

> The Trust was created to provide Father's estate with "needed liquidity to pay expenses such as estate taxes."
>
> Father intended for his accountant and the accountant for his companies to be the trustee of the Trust.
>
> Co-executors Lane and Trustmark divided their duties with Trustmark primarily handling the finances and Lane handling the legal matters, the heirs, and the family companies.
>
> The co-executors opened an estate account at Trustmark, and they collected Father's assets.
>
> The co-executors had the companies appraised by qualified independent appraisers.
>
> The co-executors determined that it would not be in the Estate's best interest to sell Father's personal residence because it was built in the middle of family property with unique blue-cypress paneling that required a lot of maintenance and upkeep. Patrick, the only person the beneficiaries could agree upon, moved into the home to maintain the home. He spent more than $40,000 for home repairs, which the co-executors decided would be reasonable in exchange for rent. According to the chancery court: "That decision was reasonable and did not diminish the [E]state in any measurable amount."

The co-executors voted the Estate's shares of the companies to elect Lane onto the boards of directors for the companies.

It was determined that each of the adult children would continue their roles in the family companies: J.O. ran Big River Shipbuilders; Patrick ran Yazoo River Towing and Vicksburg Plant Food; Lela ran a Krystle franchise and Mississippi Hardware until both closed.

Each of the adult children was elected to the board of directors of the companies their siblings ran. Lane was also on each board of directors.

At some point, all of the adult children were receiving salaries, bonuses, and other employment benefits from the companies. They additionally received directors' fees of $10,000 per year per company. Lane also received a director's fee, which he paid into the Estate as opposed to keeping it for himself.

Lane, as a director, was involved in setting the adult children's salaries, which at his recommendation, were lower than what was requested by the adult children and the companies' CPA.

Big River Shipbuilders, Yazoo River Towing, and Vicksburg Plant Food all increased in value during the pendency of the Estate.

Lane and Trustmark were satisfied that they had exercised sufficient oversight and monitoring of the family companies, and they continued to communicate about the financial conditions and operations of the companies.

Even though the Estate, therefore the co-executors, became the primary shareholder of the companies, it is not a part of the executor's duty to personally manage companies in the Estate, particularly when not qualified to do so.

The co-executors had a duty to act prudently with regard to the Estate's assets, and the court found that evidence undisputedly showed that the co-executors had fulfilled their duties.

In order to pay the Estate's taxes, the co-executors had borrowed money from the companies, sold a portion of the marketable securities in the Estate, and obtained the loan from the Trust.

13

The securities were sold for fair market value, albeit without court order, and the selling of the securities was preferable to the selling of real estate or stock in the companies.

The co-executors had expended Estate resources, without court approval, on defending two lawsuits filed by Father's former business partners. The Estate paid Lela, without court approval, for her help in defending the litigation, and such payment was not objected to by any party. Lyn's attorney Petesy also received payment for her help in the litigation.

Many of the Estate's expenditures were made without prior court approval pursuant to Lane's interpretation of Uniform Chancery Court Rule 6.07 that he could make such expenditures without approval at his own risk of the court later determining that the expenditures were not proper.

Several parties objected to certain expenditures made without court approval. First, the legal fees from various firms for various activities incurred by the Estate were reasonable and necessary fees. Further, the court found that all other expenditures were reasonable and necessary and that the co-executors have "accounted for . . . every dollar that came into the estate account . . . and every dollar that left the estate account."

In regard to Lela's and Lyn's request to remove Boolos as trustee for conflicts of interest, the court pointed out that it had reopened the record to give parties additional time to present evidence that Boolos should be removed, but at a later hearing, "no party offered or produced any evidence on this issue[.]" The court decided that "there was no substantive evidence of an actual conflict of interest involving [Boolos] . . . ."

The March 30, 2011 order, which was signed and agreed to by all beneficiaries, ratified the renewal of the loan from the Estate to the Trust and the computation of the loan balance.

Boolos's actions of agreeing to the third renewal and extension of the loan "were in accordance with the purposes of the trust and were fair, reasonable, impartial, and in the best interests of the beneficiaries."

At no point prior to Boolos's filing of the petition for declaratory relief did any of the beneficiaries raise an issue with Boolos acting as the accountant for the Trust, Estate, companies, and J.O. and Patrick, individually. Additionally, Boolos's predecessor Steve Sessums was the accountant for the Trust, Estate,

and the companies all while being trustee, and there was no conflict-of-interest issue raised.

"There is no evidence of actual hostility on the part of [Boolos]."

The court compared Boolos being the trustee and the accountant to a situation in which a bank's trust department is the trustee and also handles investments/financial services for the trust and related interests.

The court also relied on *Restatement Third of Trusts, Section 78, comment c(7)* and the *Uniform Trust Code* codified in **Mississippi Code Section 91-8-802** to provide an exception to the strict duty of loyalty. "[T]here would not be any presumed conflict so long as the transaction was fair to the beneficiaries and was in accordance with the purposes of the [T]rust."

The court also dismissed the assertion that it was a breach of Boolos's fiduciary duty to not maintain a "neutral" position when he filed the petition for declaratory relief. Using an example of a mistake in the original promissory note and deed of trust that inflated the debt owed, the court explained that, even though it would technically be in the beneficiaries' best financial interest to receive the higher amount, "it would be improper morally, ethically, and legally for [Boolos] to make such a claim in the face of clear evidence of a mistake and of the parties' intentions."

None of the parties met the burden of proof in objecting to Trustmark's and Lane's accounting or proving that either had mismanaged the Estate. Therefore, the court found no reason to surcharge the co-executors for their failure to seek prior court approval on certain expenditures.

The court declined to award punitive damages "[g]iven the absence of any improper financial benefit, fraud[,] or malice by either co-executor[.]"

Attorneys' fees were not awarded because of a lack of a statute or contract permitting the award and because no punitive damages were awarded or justified.

The Court ordered that any party who obtained the companies' financial records surrender the records and all copies of the records to the companies' attorney. Additionally, Lela was ordered to identify the location, description and persons who owned or possessed the computers on which any of the records were stored, and all stored records were to be wiped from the computers' hard drives. The companies were given the right to inspect all

identified computers or devices, at their own expense, to ensure that the data had been permanently removed.

Lastly, the court denied the motions restricting bonuses, purchases of new equipment and unnecessary expenses and the motion to compel collection of rent and for removal of the executor.

¶19. On appeal, Lela raises the following eight issues:

I. The lower court erred in finding that there was no conflict of interest regarding the actions of Substituted Trustee Todd Boolos.

II. The lower court erred in finding that the filing of the Declaratory Judgment Petition and amendments, by Substituted Trustee Todd Boolos was not a breach of fiduciary duty.

III. The lower court erred in finding the Successor Trustee managed the J.O. Smith Family Trust in a prudent and impartial manner and in the best interest of the beneficiaries.

IV. The lower court erred in failing to find that there was an actual conflict of interest by the Successor Trustee Todd Boolos.

V. The lower court erred in not allowing Lela Smith Flowers access to the corporate books and records of the companies owned by J.O. Smith, Jr. at the time of his death.

VI. The lower court erred in ordering that Lela Smith Flowers surrender the limited financial information produced to her by the intervenor companies/companies owned by J.O. Smith, Jr. at the time of his death.

VII. The lower court erred in finding that the ruling of the court dated March 30, 2011, regarding the indebtedness from the J.O. Smith, Jr. Family Trust to the Estate of J.O. Smith, Jr. was res judicata regarding the amount actually owed by the Estate to the Trust.

VIII. The lower court erred in finding that the interlocutory order of March 30, 2011, prohibited Lela Smith Flowers from later contesting the actual amount of money due by the Estate of J.O. Smith, Jr. to the J.O. Smith, Jr. Family Trust.

16

¶20.   Noah also appeals, and she raises the following eleven issues in her statement of

issues:

I.     Did the Chancellor err by failing to find that the Co-Executors breached their fiduciary duties to the minor heirs and mismanaged the estate?

II.    Did the Chancellor err by failing to find that Lane had committed legal malpractice, and that Lane and Trustmark were professionally negligent in their management of the estate?

III.   Did the Chancellor err in failing to find that the Co-Executors committed fraud when obtaining a loan from the Family Trust?

IV.    Did the Chancellor err [by] failing to find that the Substitute Trustee [Boolos] had breached his fiduciary duties by: 1) exhibiting a biased position toward the estate in the filing of the declaratory judgment petition; 2) failing to file a claim of fraud against the Co-Executors; [and 3)] failing to act in a fair and impartial manner and in the best interest of all of the beneficiaries of the trust?

V.     Did the Chancellor err in failing to find that the Family Trust was not created to pay taxes, that the estate had no authority to borrow money from the Family Trust, and that the Family Trust Trustee had no authority to lend the money without court approval?

VI.    Did the Chancellor err in finding that the testamentary trust was created according to Mississippi law?

VII.   Did the Chancellor abuse his discretion by giving the intervener companies complete access to Lela['s], Petesy['s], and [Noah]'s personal computers?

VIII.  Did the Chancellor err in finding that all interested parties had ample opportunity to review the conduct of the Co-Executors?

IX.    Did the Chancellor err in failing to find that punitive damages, including attorney's fees, were warranted?

X.     Did the Chancellor err in failing to find that the estate's accounting was improper when there was no accounting for all the inter-company loans?

17

XI. Did the Chancellor err in failing to find that Ken Lefoldt had breached his fiduciary duties as administrator?

¶21. For the sake of clarity and brevity, we will reorganize and combine Lela's and Noah's issues when doing so aids clarity.

## STANDARD OF REVIEW

¶22. In reviewing appeals taken from chancery court rulings, we apply a limited standard of review in that the factual findings of the chancery court, if supported by substantial evidence, will not be disturbed unless the chancery court abused its discretion, applied an erroneous legal standard, or its findings are manifestly wrong or clearly erroneous. *In re Estate of Baumgardner*, 82 So. 3d 592, 598 (¶15) (Miss. 2012) (citations omitted). However, questions of law receive a de novo review. *Id.*

## ANALYSIS

### I. TODD BOOLOS

¶23. According to Lela and Noah, the chancery court erred in failing to remove Boolos as trustee of the Trust. Lela's primary issue is that Boolos had a conflict of interest in that he was the trustee of the Trust while he was also the CPA for the Estate, J.O., Patrick, and the family companies. Lela explained that Boolos's conflict became apparent when the petition for declaratory relief he filed was not neutral and, instead, favored the Estate, J.O., Patrick, and the companies by claiming the amount owed on the loan was lower than the amount Lela and Noah had urged. Further, Lela points out that she inherits less money from the Estate than J.O. and Patrick; therefore, Boolos's recommendation that the Estate owed less money would benefit his clients– the companies, J.O., and Patrick– to her and the Trust's detriment.

18

In essence, the claim against Boolos is that his position on the loan amount was not in the best interest of the Trust and *all* of the Trust's beneficiaries; therefore, according to Lela, the chancery court should have removed Boolos as the trustee. Noah echoes Lela's concern over Boolos taking a nonneutral position in filing the petition for declaratory relief. Additionally, Noah claims that Boolos had a direct interest in being appointed as trustee because it would help maintain his client bases. Noah goes on to list several other of Boolos's actions that she claims justified his removal as trustee, such as breaching "his duty of trust, loyalty, impartiality and duty to communicate with the beneficiaries in not keeping them informed of his actions and how he was going to get the loan repaid[;]" failing to prosecute the co-executors for fraud; creating hostility, engaging in self-dealing, and generally, not acting prudently and impartially to the Trust and its beneficiaries.

¶24.   In spite of Lela's and Noah's assertions on appeal, the record belies their claims. In its December 2013 order, the chancery court denied Lela's and Noah's motions to remove Boolos, noting that it considered the testimony and documentary evidence presented over the course of six hearings when making its decision. Lela filed a motion for the chancery court to reconsider its December 2013 order, and the chancery court granted the motion and reopened the record for more evidence about Boolos's actions as trustee. However, as the chancery court noted in its final findings of fact and conclusions of law, "no party offered or produced any evidence on this issue; and the record was closed."

¶25.   In its findings of fact and conclusions of law, the chancery court thoroughly addressed the allegations that Boolos had a conflict of interest and/or had breached his fiduciary duties.

The chancery court stated that there was "no evidence that . . . Boolos was the de-facto bargaining agent for the Estate or any other Smith entity or beneficiary. He acted only as the Estate's accountant and the accountant for the companies, handling primarily tax returns and related matters." Boolos had no personal interest in the Trust, the Estate, or any of the companies. Further, even though all of the beneficiaries were aware of Boolos's roles, no one suggested there was a conflict or that Boolos should resign or be removed until Boolos filed the petition for declaratory relief. Additionally, there was expert testimony[5] by Angela Healy, who testified when asked by the chancellor, that there was not a conflict of interest for a person to act as a CPA and a trustee because "the discretion is within the duty of the trustee[,]" whereas, the CPA's role of preparing tax returns is a "perfunctory-type duty." The chancery court also explained that Section 78, comment c(7) of the *Restatement Third of Trusts* provided an exception to a trustee's duty of loyalty that "[t]he duty of loyalty does not preclude trustees in their fiduciary capacity from dealing with other trusts or with decedents' or conservatorship estates, including trusts and estates of which the trustee is a fiduciary."

¶26. In regard to the claims that Boolos had breached his fiduciary duties, the chancery court explained that, "based on clear evidence of mistake and judicial ratification and to resolve the unsubstantiated claims" questioning the validity and amount of the loan, Boolos's filing of the petition for declaratory relief was "in the best interest of all trust beneficiaries to determine the validity and the amount of debt." Further, "[i]t would be in the best interest

---

[5] Healy's testimony was given in the context of whether trustee Sessums had acted prudently; however, Boolos took over the same roles as Sessums. Sessums's actions are not being challenged on appeal. It appears that the chancery court relied on Healy's testimony in coming to a conclusion about Boolos's actions too.

20

of the beneficiaries for the documents to reflect the correct, intended figure, even if it is lower than the erroneous figure. Therefore, [Boolos] should be able to acknowledge the mistake and seek to correct it without violating his fiduciary duty."

¶27. "A court of chancery . . . has inherent power to remove the trustee for good cause, such power being incidental to the court's paramount duty to see that trusts are properly executed, and the trust estate preserved, and as broad and comprehensive as the exigencies of the case may require." *Walker v. Cox*, 531 So. 2d 801, 803 (Miss. 1988) (quoting *Yeates v. Box*, 198 Miss. 602, 22 So. 2d 411, 415 (1945)). The Court has further explained that "[d]isagreement and unpleasant personal relationships between the trustee and the beneficiaries are not usually enough to warrant removal." *Id.* at 804 (quoting *Bogart, Law of Trust* §160 (5th ed. 1973)). Ultimately, while noting that it had concerns about Boolos's "mixed and varied responsibilities[,]" the chancery court concluded that "after a careful review of the law, the facts, [and] the total lack of any evidence presented by the objectors" that none of the claims for the removal of Boolos had a basis in fact or in law. We hold that the chancery court's findings are thorough and consistent with the testimony presented during the hearings; thus, the findings are supported by substantial evidence in the record.

## II.    ACCESS TO CORPORATE RECORDS

¶28.    Lela submits that the chancery court erred in refusing her access to the companies' corporate books and records. There was much discussion throughout the hearings about Lela's right to access the records. Initially, the chancery court determined that Lela had not properly specified the reasons she wanted to review the records as required. However, the

21

chancery court did order the companies to produce the records on a zip drive in the Peachtree format to be held by the chancery court in case Lela ever needed to protect herself as a director in the future. Later, the chancery court, sua sponte, released the zip drive to Lela and Noah. Then, there was an issue that Lela and Noah could not open the documents from the zip drive due to an issue with the Peachtree program, so the companies provided the hard copies of the documents requested. Additionally, during Noah's testimony, it was discovered that Lela was able to and did in fact access and review the Peachtree documents from the zip drive for at least two of the companies.

¶29. According to Lela, while she was a director for the companies, she requested the companies' records to review; however, her brothers and Lane had refused her request. Lela, still a director of the companies, then filed a motion to examine the records, which her brothers and Lane challenged and resisted. Lela was removed as a director later .

¶30. Mississippi Code Section 79-4-16.05(a) (Rev. 2013) provides that directors are "entitled to inspect and copy the books, records and documents of the corporation at any reasonable time to the extent reasonably related to the performance of the director's duties as a director, . . . but not for any other purpose or in any manner that would violate any duty to the corporation." Subsection (c) provides that the chancery court "may include provisions protecting the corporation from undue burden or expense, and prohibiting the director from using information obtained upon exercise of the inspection rights in a manner that would violate a duty to the corporation . . . ." Miss. Code Ann. §79-4-16.05(c) (Rev. 2013). Lela makes an additional argument that her status as a specific beneficiary of the companies'

stocks pursuant to Father's will entitled her access to the corporate records pursuant to Mississippi Code Section 79-4-16.02.

¶31. Notwithstanding Lela's status as a director or shareholder, Lela's claim that the chancery court "severely restricted and otherwise denied her request for complete access to the books and records of the corporations[]" is without merit. Lela has not articulated which documents she was prevented from reviewing or that the documents she was given were incomplete, incorrect, or misleading that would warrant granting her unfettered access to the companies' records, particularly in light of the evidence that she had personal reasons aside from her duties as a director and shareholder to seek the documents.[6]  In short, the chancery court's order complied with the relevant statutes by allowing Lela access to the books and records, with restrictions, and we detect no abuse of discretion or error.

¶32. Noah also claims that the chancery court erred in allowing the companies' attorney access to her, Petesy's, and Lela's personal computers to confirm that the companies' documents were erased from their personal computers. Noah further explains that she could find no cases in which the trial court "ordered invasion of a computer after granting an order

---

[6] Lela also claims that "[n]o one has demonstrated or suggested how [her] request to see the corporate books and records is hostile[] or harmful[] to the companies." However, there was evidence, and it was even admitted by Lela's attorney, that Lela had personal reasons beyond her duties as a director to review the corporate documents. For example, Lela sent her brothers – and copied Lane and a couple of other individuals – correspondence saying "I want the books of my father's estate and all companies he owned since his death ASAP." The rest of the correspondence focused on the loan between the Estate and the Trust and other Estate/Trust matters. Additionally, Lela indicated in her deposition testimony that she did not care about the continuation of the companies as long as the Estate benefitted from the liquidation of the companies.

allowing the use of the data." Noah submits that less invasive alternatives were available. Noah's issue is without merit.[7]

¶33. The chancery court held that all parties who received copies of the companies' records should surrender all of the records to the companies' attorney and "[a]ll of such data shall be deleted from the hard drives of the computers to which they were transferred or otherwise stored in any format." Further, the chancery court permitted the companies, at their expense, "to inspect any and every computer/device identified . . . to confirm that all data has been deleted and permanently removed therefrom." Both Section 79-4-16.04 involving shareholders' rights to inspect corporate records and Section 79-4-16.05 involving a director's inspection of corporate records allow trial courts to impose reasonable restrictions on the use or distribution of the records. We can find no evidence that the chancery court abused its discretion in imposing the restriction; therefore, the issue is without merit.

### III.    MARCH 30, 2011, RULING

¶34. On March 30, 2011, the chancery court entered an order granting the co-executors' request to borrow money to pay the Estate's taxes and other administrative expenses. The order, which was signed by all of the parties, also allowed for the extension and renewal of the loan and authorized the co-executors to "execute all such notes and deeds of trust, extensions, and renewals . . . ." The co-executors did execute the renewal, which listed the current indebtedness as $2,326,636.69 with an annual four percent interest rate.

---

[7] Noah admits in her brief that her computer has not been subject to search. Only Lela's has been searched, and Lela has not raised the issue on appeal.

¶35.   Then, on May 8, 2013 (later amended on November 19, 2013) the chancery court entered a judgment addressing the propriety of the original loan, the applicability of late payment provision, the proper method of computing interest on the loan, and the current balance of the loan. The chancery court's judgment incorporated the March 30, 2011, order and found that it was binding upon the parties and was the law of the case. More specifically, the chancery court found that the March 30, 2011, order "was a ratification of the past actions relative to the borrowing of money and obligations to repay and the amounts as set for and/or referenced therein and is binding . . . ." The chancery court concluded that "the parties cannot, absent fraud, be permitted to attempt to alter or amend a prior order of the court to which they gave their approval and/or to which they did not attempt to either appeal or seek to set aside and/or modify or amend . . . ." In addition, the chancery court addressed the inclusion of a late payment provision in the deed of trust but not in the promissory note. Lela claimed that the provision should be included in the calculations, while the co-executors and trustees all claim that the provision was included accidentally in the deed of trust and should be considered a scrivener's error or mutual mistake. The chancery court's judgment explained that the parties who executed the deed of trust and promissory note were the Estate and the Trust, and "the parties [(Lela and Noah)] now complaining or objecting to the terms and provisions of the original note and deed of trust and those renewals therefore were not/are not lender nor borrower in those transactions." The court further found that the late payment provision, "if it ever existed, was waived and/or forgiven or found to be not applicable and binding by virtue of the March 30, 2011 prior

order of this court." Pursuant to the judgment, the amount owed on the loan, as of May 23, 2013, was $2,523,004.83 plus four percent interest per annum.

¶36.    Lela claims on appeal that the chancery court erred in determining that the March 30, 2011, order was a final order preventing her from contesting the amount owed to the Trust. First, she claims that *res judicata* is not applicable in the present case because the March 30, 2011, order was interlocutory in nature.  Lela also claims that she is not judicially estopped from challenging the March 30, 2011, order because her signature on the order is not a sworn statement or a statement made under oath as required for judicial estoppel to apply.  Lela further contends that judicial estoppel is not available when an alleged statement was made through mistake or without full knowledge, which she claims is what happened when she signed the March 30, 2011, order.

¶37.    Lela's claims are without merit.  First, Lela's judicial estoppel claim need not be addressed because judicial estoppel was not raised at trial and the chancery court never applied the doctrine to Lela's claims.  Second, Lela's claim that the chancery court erred in finding that the March 30, 2011, order was binding fails.  The March 30, 2011, order was signed by all of the adult children and the representatives of the minor children.  In *Smith v. Malouf*, 826 So. 2d 1256, 1259 (¶10) (Miss. 2002) (quoting *Guthrie v. Guthrie*, 233 Miss. 550, 556-7, 102 So. 2d 381, 383 (1958)), the Court explained that an agreed order or consent judgment "acquires the incidents of and will be given the same force and effect as, judgments rendered after litigation.  It is binding and conclusive, operating as *res judicata* and an estoppel to the same extent as judgments after contest."  Further, prior to its May 8, 2013,

26

judgment, the chancery court did allow Lela to put on her testimony and evidence, at length, about what she claimed the actual amount owed on the loan was and whether the late payment provision should be included in the calculations; thus, she had an opportunity to contest the amount owed.

¶38.    Lela also claims that the chancery court should have construed the promissory note and the deed of trust as a global transaction; therefore, the late payment provision should have been left in the documents and used in the calculations to determine the amount owed on the loan.  "Under general principles of contract law, separate agreements executed contemporaneously by the same parties for the same purposes and as part of the same transaction are to be construed together." *Sullivan v. Protex Weatherproofing, Inc.*, 913 So. 2d 256, 259 (¶21) (Miss. 2005) (citing *Sullivan v. Mounger*, 882 So. 2d 129, 135 (¶32) (Miss. 2004) (quoting *Neal v. Hardee's Food Systems, Inc.*, 918 F. 2d 34, 37 (5th Cir. 1990)).  Lela asks the Court to ignore the testimony from the trustee, the co-executors, and the drafter of the documents that the inclusion of the provision was inadvertent, based on the premise that a person is under an obligation to read and understand the contract he is signing before signing it.  *See Bailey v. Estate of Kemp*, 955 So. 2d 777, 783 (¶22) (Miss. 2007). Lela asserts that the testimony from the trustee, the co-executors, and the drafter of the documents is parol evidence that the Court should not accept.  However, Lela's claim regarding the chancery court's reformation of the deed of trust to remove the late payment provision also fails.  Though there is no problem with construing the documents as a global transactions, the fact remains that the Estate, as the borrower, and the Trust, as the lender,

both claim that there was a mutual mistake in the inclusion of the provision. Lela's claim that the Court cannot use parol evidence is belied by the Court's explanation in **Bedford v. Kravis**, 622 So. 2d 291, 294 (Miss. 1993) (quoting **Smalley v. Rogers**, 232 Miss. 705, 710, 100 So. 2d 118, 120 (1958)):

> It is practically a universal rule that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is admissible to establish the fact of fraud or of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had, and this, even though the instrument in question is within the the [sic] statute of frauds. So far as the introduction of such proof may be said to violate the statute, it is immaterial whether it comes from the complainant or the respondent. The nature of the action is such that it is outside the field of operation of the parol-evidence rule. If this were not so, a rule adopted by the courts as a protection against fraud and false swearing would, as has been said in regard to the analogous rule known as the statute of frauds, become the instrument of the very fraud it was intended to prevent. Evidence of fraud or mistake is seldom found in the instrument itself, and unless parol evidence may be admitted for the purpose of procuring its reformation, the aggrieved party would have as little hope of redress in a court of equity as in a court of law.
>
> Generally, it may be said that any testimony which tends to prove the mistake alleged or the intention of the parties is admissible. A witness in a position to know may testify concerning the intention of the parties to an agreement, to the same effect as to any other fact.

Here, both the Estate and the Trust testified the that late payment provision was included as a mistake or oversight. Based on the unequivocal testimony from both parties to the documents, the chancery court did not err in reforming the deed of trust to reflect the parties' intentions.

## IV. TRUSTMARK AND ERNIE LANE

¶39.   Only Noah raises any appellate issues against the co-executors Trustmark and Lane. Noah claims that the chancery court erred in failing to find that the co-executors had breached their fiduciary duties with respect to the minor heirs; that Lane had committed legal malpractice, that both were professionally negligent, and that the co-executors had committed fraud in obtaining the loan from the Trust. Additionally, Noah claims that she did not have ample opportunity to review the co-executors' conduct. Noah also takes issue with the accountings filed by Lane and Trustmark on behalf of the Estate. Lastly, Noah claims that the co-executors and Lefoldt have breached a duty by not having a representative of the Estate on the boards of directors at all times.

### A.  Co-Executors' Fiduciary Duties

¶40.   According to Noah, the co-executors "established a pattern of ignoring the duties of [e]xecutors." First, Noah claims that the co-executors never attempted to make sure all of Father's property was gathered and distributed to the heirs under the terms of the Father's will. It appears that the basis of Noah's issue is that some of the heirs have benefitted from the use of several properties and assets of the Estate at the expense of the other heirs. Beyond a claim of uncollected rent, which will be discussed later, Noah provides no examples of property or assets that the co-executors have not gathered, and her assertion is inconsistent with Lane's uncontradicted trial testimony that he and Trustmark did gather all of Father's assets. With regard to the co-executors' failure to distribute the Estate's assets, Noah fails to take into consideration that the Estate has been embroiled in litigation almost since the day it opened, including a possible challenge to the third codicil of Father's will.

29

Additionally, she does not identify the assets that the co-executors should have distributed, particularly in light of the continued litigation over the Estate.

¶41.    Second, Noah claims that the co-executors mismanaged the Estate's assets and failed to assist the Estate in making an income by failing to collect rent on certain properties, specifically property on which the companies are located.  Noah asserts that the fact that Father never charged rent for the properties fails because now the ownership of the land is divided among the several heirs.  Noah also claims that the co-executors did not take a strong enough role in the management of the companies to ensure that the companies were being run prudently.  In his testimony at trial, Lane explained that the co-executors did not start charging the companies rent because the property still was jointly owned by another person; therefore, half of any rent would have to be paid to the other person, who happened to be involved in two lawsuits against the Estate.  Lane further reasoned that, since the Estate owned the majority of the companies and the companies were the income producing parts of the Estate, paying rent would be like taking money from one pocket of the Estate and putting only half into another pocket.  In regard to Patrick's use of Father's house without paying official rent, the chancery court agreed that the co-executors' decision not to sell the house due to the location and type of house and not to charge Patrick rent in exchange for his out-of-pocket maintenance of the home (approximately $46,0000), "was reasonable and did not diminish the [E]state in any measurable amount."

¶42.    Next, Noah asserts that the co-executors paid claims against the Estate that were barred by statute because the claims were not registered with ninety days' notice to creditors.

30

Noah identifies only one claim that was paid improperly, but Noah fails to provide any other information to aid the Court in analyzing her claim. Additionally, Noah claims that the co-executors liquidated some of the Estate's investment securities without following Mississippi Code Section 91-7-255 and failed to give notice of the liquidation to the minor heirs' representatives. Again, Noah does not provide enough information for appellate review.

¶43. Noah makes several bullet-point claims concerning actions or inactions of the co-executors that allegedly were breaches of their fiduciary duties. First, she says that the co-executors committed professional misconduct by filing a form with the IRS stating that a testamentary trust had been created for each minor when in actuality, no property had been delivered to any testamentary trusts. Noah also claims that the co-executors "[c]reated an atmosphere of hostility between themselves and some of the heirs and between the heirs themselves." The co-executors also explained they did not seek court approval for certain expenditures because they could not get court approval fast enough, but Noah says that the co-executors actually never tried to get court approval. Noah also has issue with the co-executors' failure to timely close the Estate and alleges that the co-executors' conduct was an "intentional, reckless pattern of behavior which depleted the [E]state without seeking means to protect the assets or gain income." Noah claims that such conduct entitles her to punitive damages and attorneys' fees. All of the above issues lack any semblance of true analysis; therefore, we cannot address the issues as raised.

¶44. Further, the chancery court thoroughly addressed the co-executors' conduct and failure to seek court approval and ultimately concluded that, though it did not condone the

31

co-executors' failures in seeking prior court approval, it was satisfied that all other expenditures were reasonable and necessary and that the co-executors have "accounted for . . . every dollar that came into the estate account . . . and every dollar that left the estate account." We are satisfied that the chancery court did not err in coming to its conclusion.

B.      Legal Malpractice and Professional Negligence

¶45.    Next, Noah asserts that Lane committed legal malpractice by doing "nothing to ensure that the [E]state could be properly run and fail[ing] to ensure that the [c]o-executors received [chancery court] authority . . . needed to distribute the real and personal property of the [E]state, to raise funds and to pay necessary expenses and taxes, and to create the testamentary trust for the minor heirs." Noah explains that "a direct result of Lane's negligence" was that the Estate "spent money it should not have, lost the value of stocks that were improperly liquidated, failed to gain income from good management of the [E]state[']s assets, and suffered a decline in the value of the shares on the companies held by the [E]state." Lastly, with regard to Lane, Noah claims that Lane misrepresented facts or gave false/misleading answers to the heirs and others, and created conflicts of interest between himself and the Estate.

¶46.    Noah also claims that Trustmark was professionally negligent because it held itself out to be an entity with special knowledge or skill in a certain area–i.e., wealth management and estates– therefore, it should be held to a "higher standard of duty" than an ordinary individual. Noah alleges that Trustmark failed to follow federal regulations and failed to check Lane's actions throughout the time they were co-executors.

32

¶47. No specific claims of legal malpractice or professional negligence were brought against the co-executors at trial; therefore, the issue is not reviewable on appeal. *See Mathis v. ERA Franchise Sys., Inc.*, 25 So. 3d 298, 303 (¶17) (Miss. 2009) ("It is a fundamental rule of appellate procedure that, absent extraordinary circumstances, this Court will not consider issues raised for the first time on appeal.")

C. Fraud

¶48. According to Noah, the co-executors' "actions demonstrate a pattern of concealment, deceit, and misinformation that permitted [them] to drain the . . . Trust of most of its liquid assets." Noah asserts that the co-executors committed fraud by obtaining the loan from the Trust because they testified that there was never any intention for the Estate to pay back the loan and because the co-executors did not have the companies' officers sign the deed of trust for the property that was used as collateral. Noah also takes issue with the co-executors' encumbrance of the Estate's property as collateral for the loan without following the requirements of Mississippi Code Sections 91-7-213, 91-7-215, and 91-7-227.

¶49. As Lane points out in his brief, fraud was never raised in the chancery court. "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Miss. State Fed'n of Colored Women's Club Housing for Elderly in Clinton, Inc. v. L.R.*, 62 So. 3d 351, 361 (¶26) (Miss. 2010) (quoting *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985)). Moreover, Noah cited only one case in her discussion of the issue, and that case stood only for the proposition that the minors were interested parties who should have received notice of any action that would encumber

property belonging to the estate. *See **Harper v. Harper***, 491 So. 2d 189, 202 (Miss. 1986). The case cited does not even address fraud. Mississippi Rule of Appellate Procedure 28(a)(6) provides that an appellant's brief "shall contain the contentions of the appellant . . . and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." "It is the duty of an appellant to provide authority in support of an assignment of error[,]" and the failure to do so is considered abandonment of the issue; thereby making the issue procedurally barred for appellate review. ***McNeil v. Hester***, 753 So. 2d 1057, 1075 (¶65) (Miss. 2000) (citations omitted). Again, we decline to address the issue raised.

D.     Opportunity to Review Co-Executors' Conduct

¶50.    While Noah titles the issue as the chancery court erred in finding that the parties had ample opportunity to review the co-executors' conduct, the actual substance of the issue does not reflect the title. Instead, it appears that Noah simply is using the substance of the issue to point out that neither Lela nor Noah had any legal representation in any of the matters until 2009, and Noah now claims that all of the professionals involved are "complicit in their attempts to hide assets and force [Lela and Noah] to settle for pennies on the dollar." Again, Noah does not provide a citation to authority or to the record, nor does she provide a legitimate analysis that would enable the Court to address the issue. *See* M.R.A.P. 28(a)(6), *McNeil*, 753 So. 2d at 1075 (¶65) (citations omitted).

E.     Accountings

34

¶51. Next, Noah claims that the Estate's accounting submitted by the co-executors was incomplete and improper because "there was no accounting for the inter[]company loans[.]" According to Noah, the lack of an accounting for the intercompany loans meant that the chancery court did not get a full picture of Estate's accounts; therefore, the chancery court could not adequately determine whether the expense was a legitimate charge upon the Estate. Noah further explains that accountings of the intercompany loans mattered because it could be that the co-executors allowed the larger companies, of which the minor heirs had less inheritance, to drain the smaller companies, of which the minor heirs would inherit more equal shares.

¶52. Noah has not provided any citation to the record to show that the chancery court heard any testimony regarding intercompany loans, much less any testimony that the larger companies were taking loans from the smaller companies to the detriment of the minor heirs. In regard to Noah's and Lela's challenges to the accounting, the chancery court explained: "Despite being afforded multiple opportunities to do so, the objectors in this case never met their burden of proof. They did not show the accountings were inaccurate, and they did not otherwise show the [co-]executors had failed in their duties of administration or that any alleged failures resulted in any harm to the [E]state." The chancery court concluded that "[t]he [c]ourt, and the interested parties, have studied the co-executors' accountings. No deficiencies have been proven." We agree.

F. Board of Directors

35

¶53. Lastly, Noah claims that, first, Lane and Trustmark, and then, Lefoldt breached a duty to have an Estate representative sit on each of the companies' boards of directors. Again, Noah's initial statement of her issue does not match the substance of her argument. From the beginning until 2012, Lane did sit on the boards of directors of the companies and voted the stock owned by the Estate, so Noah's claims otherwise are incorrect. According to testimony at trial, the value of most of the companies increased while Lane was on the boards of directors, and the chancery court was satisfied with Lane's oversight of the companies while he was on the boards of directors.

¶54. Additionally, Noah cites Uniform Chancery Court Rule 6.09 to discuss the requirements for making loans or investments where minors are involved. She asserts that the co-executors never failed to follow the rule and then immediately switches her argument back to her statements that, presently, there is not a representative of the Estate sitting on the boards of directors. Noah did not provide a citation to the record where Rule 6.09 was ever raised or brought to the chancery court's attention. Next, Noah also notes that Lela's removal from the boards of directors was a "squeeze out" which Lane should have stopped while he was on the boards of directors; however, Lela's removal was not an issue at trial and was not ruled upon by the chancery court. Because the issues were not raised at trial or addressed by the chancery court, they are not proper for review. "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Miss. State Fed'n of Colored Women's Club Housing for Elderly in Clinton, Inc. v. L.R.*, 62 So. 3d at 361 (¶26) (quoting *Mills v. Nichols*, 467 So. 2d at 931).

36

## V.     TESTAMENTARY TRUST

¶55.    Next, Noah claims that the chancery court erred in finding that a testamentary trust had been created. Vaguely citing **Harper v. Harper**, 491 So. 2d 189, 196 (Miss. 1986), Noah asserts that a trust is not created until the trust is funded with the corpus, and until the trust is created, the testamentary trustees have no power. According to Noah, the testamentary trusts have not been funded, even though there is testimony and an IRS 706 tax form stating that each testamentary trust has $373,961. Nonetheless, Noah claims that without the corpus, the testamentary trusts have not been created, leaving the testamentary trustees with no power. Noah gives no other citations to the record or law, elaboration, or explanation on the issue, nor does she specify what relief she seeks. Again, the issue is procedurally barred for appellate review. *See* M.R.A.P. 28(a)(6); **McNeil**, 753 So. 2d at 1075 (¶65) (citations omitted).

## VI.    TRUST'S PURPOSE

¶56.    Noah claims on appeal that the chancery court erred in determining that the purpose of the Trust was to pay taxes. Instead, Noah asserts that Father's "clear and unambiguous intention was to maintain his children and grandchildren." While Father's overarching intention for the Trust was to provide for and maintain his children and grandchildren, the analysis is actually more complex than that.

¶57.    According to the chancery court, Father created the Trust "to provide his estate with needed liquidity to pay expenses such as estate taxes." However, such purpose is not reflected explicitly in the Trust's documents. Instead, Sessums testified that the purpose of

37

the Trust was to "try to exclude [Father's] life insurance proceed[s] from . . . [his Estate.]" Lane testified that he, Father, and Boolos discussed the Trust and that the Trust was to "take care of income taxes or shield – help [Father's] estate and children pay taxes in the event he died." Additionally, Boolos testified that he helped Father create the Trust and "the main purpose [of the Trust] was to prevent the proceeds of the life insurance trust to be included in the taxable estate of the decedent. And second was to provide liquidity for estate taxes." James Dossett, a tax attorney retained by the Estate and Trust in the matter, testified that it is common for trusts like Father's to not contain a specific reference about the use of the trust to pay taxes. Dossett further testified that, "[i]f the proceeds [of the Trust] can – under the terms of the trust agreement can be used for payment of the estate tax, direct payment of the estate tax, then the IRS takes the position that the assets of the trust, irregardless of the three year rule, are included on the taxable estate."

¶58.    In ***Reedy v. Johnson's Estate***, 200 Miss. 205, 210-11, 26 So. 2d 685, 687 (1946), the Court explained:

> It is the rule generally that the "administration of a trust must accord strictly with the intent of the settlor and the terms of the trust, and while ordinarily even a court of equity has no authority to authorize the trustee to depart therefrom, and will do all within its power to see that the trust is executed in accordance with its terms, *it is generally agreed that a court may, upon the occurrence of emergencies or unusual circumstances not anticipated by the settlor, or in order to carry out his ultimate purpose, and to preserve, or to prevent loss or destruction of, the trust estate*, or, according to some authority, in the interest of beneficiaries or to save them from some plight, permit the trustee to the extent necessary to such an end, to deal with the trust estate contrary to or in deviation from the express or literal terms of the trust instrument or declaration."

38

(Emphasis added). The present case is an unusual circumstance–Father's death occurring within the three-year period, thereby subjecting the Trust's life insurance proceeds to be taxed as part of the Estate–sufficient to give the chancery court authority to deviate from the explicit purpose of maintaining Father's children and grandchildren, specifically in light of Dossett's testimony that including a tax-payment provision would likely pull the Trust proceeds into the Estate for tax purposes.[8] Thus, the chancery court did not err in determining that a purpose of Father's Trust, though not explicit in the Trust document, was to provide liquidity to assist paying Estate taxes.

## VII. REQUESTS FOR FEES

### A. Noah

¶59. Finally, Noah claims that the chancery court erred in failing to award her punitive damages and attorneys' fees. We disagree. In her brief, Noah provides quotations from caselaw in almost a bullet-point manner, and the full extent of her analysis, application, and discussion is as follows: "Lane and Trustmark admitted their misconduct and misrepresentations to the heirs at the signing of the trust loan. Their actions, as professionals is [sic] so offensive to justice that sanctions are necessary to curtail future behaviors. They have been willfully, grossly negligent in their duties, amounting to misfeasance." First, "[t]he decision of the finder of fact . . . should not be disturbed absent exceptional

---

[8] Alternatively, the loan from the Trust for the payment of Estate taxes indirectly goes to the maintenance of Father's children and grandchildren by allowing the family-owned companies from having to sell the shares or property to satisfy the Estate's taxes; thereby keeping everything in the family. At the time, all of Father's children were working for or in some way directly benefitting from the family-owned businesses.

39

circumstances[,]" and "[a]bsent statutory authority or contractual provisions, attorneys' fees cannot be awarded unless punitive damages are also proper." *Warren v. Derivaux*, 996 So. 2d 729, 739 (¶31) (Miss. 2008) (citation omitted). Noah's request for punitive damages and attorneys' fees fails based on the chancery court's finding and the Court's agreement that the co-executors' and trustees' actions were not in error. Noah is not entitled to any type of damages in the present case.

### B. Sessums

¶60. Pursuant to Mississippi Rule of Appellate Procedure 38, Steve Sessums filed a motion asking the Court to award him his attorney's fees and costs associated with defending himself on appeal based on Noah's claim that she was entitled to attorneys' fees and punitive damages. Rule 38 provides: "In a civil case if the Supreme Court or Court of Appeals shall determine that an appeal is frivolous, it shall award just damages and single or double costs to the appellee." Whether an appeal is frivolous pursuant to Rule 38 is evaluated using the standard from Mississippi Rule of Civil Procedure 11. *Harris v. Harris*, 988 So. 2d 376, 380 (¶16) (Miss. 2008). Accordingly, an appeal is frivolous where the appellant has no hope of success. *Id.*

¶61. Noah's claims against Sessums are that he failed to follow the terms of the Trust because the Trust did not authorize him to lend money from the Trust and that he breached a standard of care or duty by entering into the loan. Lela raised no issues against Sessums and did not contest the validity or prudence of the loan. We find Sessums's motion to be well-taken and grant his motion requesting attorneys' fees and costs in defending the present

40

appeal, with Noah being responsible for paying the costs. With regard to the authority and standard of care applicable to Sessums, uncontradicted expert testimony by Angela Healy was that Sessums had acted prudently and without a breach of his duties. Noah did not cross-examine Healy on her testimony nor did she present any testimony to the contrary; therefore, the Court is unsure how Noah could hope to have success on an issue in which she had not presented any proof at trial.

## CONCLUSION

¶62.   Near the beginning of its findings of fact and conclusions of law, the chancery court aptly explained: "[T]his matter is exceedingly challenging; the twists and turns in this case and the complexity and number of the issues that present herewith have pushed the envelope . . . ." We affirm the chancery court's decision. We grant Sessums's motion for appellate attorneys' fees and costs and remand the case to the Warren County Chancery Court with directions that it determine the amount of Sessums's appellate attorneys' fees and costs and to enter an appropriate judgment for that amount.

¶63.   **AFFIRMED AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, KING, MAXWELL AND BEAM, JJ., CONCUR.**