## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01641-COA

IN RE ESTATE OF HARRY J. GREEN,                           **APPELLANT**
DECEASED: ELIDE CRISTINA GARRIDO
GREEN

v.

SHIRLEY COOLEY AND WILFORD GREEN               **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/11/2018 |
| TRIAL JUDGE: | HON. C. MICHAEL MALSKI |
| COURT FROM WHICH APPEALED: | LEE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MARK NOLAN HALBERT |
| | CYNTHIA TRANELL LEE |
| ATTORNEY FOR APPELLEES: | CHRISTOPHER G. EVANS |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 09/10/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND C. WILSON, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     Cristina Green appeals the decision of the Lee County Chancery Court to award eight of her late husband's properties to his sister, Shirley Cooley. The chancery court found that Harry delivered the December 31, 2003 deeds to Shirley, and that Harry intended that Shirley own the properties in question. We affirm.

### FACTS

¶2.     During his lifetime, Harry Green amassed a large estate consisting of various properties. On December 31, 2003, Green had his attorney draft eight deeds that conveyed the following properties to his sister Shirley:

1.    1201 Nixon Drive, Tupelo, MS

2.    The "Main Street Warehouse," Shannon, MS

3.    The Monroe County Land, Nettleton, MS

4.    The "Shannon Lot"

5.    Temple Circle, Shannon, MS

6.    The "White Lane Property," Nettleton, MS

7.    The "Two Houses and Green Valley Lab," Shannon, MS

8.    The Summit[1]

Shirley was not present when these deeds were signed. In fact, both parties agree that she was at her home in Texas at that time. Further, there is no indication in the record that she ever knew the transaction occurred in December 2003. After the deeds were properly acknowledged before a notary public, Harry took the deeds with him for safe keeping. Harry did not deliver the deeds to Shirley at that time, nor did he file them in the county clerk's office.[2]

---

[1] The Summit property is not considered in this appeal. At trial, Shirley testified that she signed a deed that transferred the Summit property back to Harry twice. She first signed on January 15, 2004. Years later, in 2009, however, Harry came back to Shirley and told her she needed to re-convey the property because he wanted to get a "homestead exemption," and build a home for him and Cristina. Because the Summit property was in Harry's name at the time of his death, it passed to Cristina and was not at issue at the trial level. The chancellor, however, took this as a sign of Harry's intent. Mainly, that if Harry wanted the other properties in his name, he would have asked Shirley to sign the deeds and record them like he did with the Summit property.

[2] The December 31, 2003 deeds signed by Harry to Shirley were later filed in the Lee County Chancery Clerk's office on December 4, 2004 and were delivered to Shirley by

¶3.    Later, on January 15, 2004, Shirley was visiting Harry and their mother in Mississippi. Harry asked Shirley to come with him to his attorney's office in Houston, Mississippi to sign some papers. Shirley testified that she signed "everything that was put in front of [her]." The record indicates that Shirley signed the following warranty deeds on January 15, 2004: (1) 1201 Nixon Drive; (2) the Main Street Warehouse; (3) the Monroe County Land; (4) the Shannon Lot; (5) Temple Circle; and (6) the Beauty Shop and House in Monroe County. Shirley told the chancellor that Harry did not tell her anything about why he wanted her to sign the deeds, but that she just trusted Harry. The warranty deeds signed on January 15 were never properly acknowledged or filed. Harry took the deeds with him when he left, and those deeds were never found.[3]

¶4.    Harry met Cristina in 2003. On January 31, 2004, Harry married Cristina in Las Vegas, Nevada. Cristina testified at trial that Harry "never told [her]" that Shirley owned any of his properties, including the home on Nixon Drive that the newlyweds were living in. Likewise, Cristina testified that her husband kept his business affairs secret. However, Lisa Diallo, a deputy clerk for Lee County, testified that Harry told her his properties were in Shirley's name because he trusted her and his "wife [was] from across the water," and he did not want her to take the property. The chancellor specifically cited this fact in his opinion.

¶5.    On November 26, 2004, Harry conveyed by quitclaim deed the ninth property, the

---

Harry that same month.

[3] Copies of the signed, non-acknowledged, unfiled deeds were later found in the attorney's office, but the original deeds Harry took with him were never found.

3

Plantersville property, to Shirley. Like the deeds signed on December 31, 2003, Shirley was not present and the deed was properly acknowledged. A few days later, on December 3, 2004, Harry traveled to Texas and delivered all of the December 31, 2003 warranty deeds and the November 26, 2004 quitclaim deed to Shirley. Shirley testified that she "put the deeds away," and that Harry told her that in the case something happened to him, she would "know what to do." The December 31, 2003 deeds were recorded on December 4, 2004, except for the Monroe County properties (White Lane and the Monroe County land). Shirley actually filed the White Lane property and the Monroe County land warranty deeds after Harry's death in 2010.

¶6. Harry continued to pay taxes on the properties, do routine maintenance, and collect rent. When Harry went to borrow money against the Plantersville property in 2010, however, he asked Shirley to sign the papers required to do so. Shirley testified that Harry had also borrowed against the home at 1201 Nixon Drive twice before. These transactions also required her signature for approval. The chancellor's opinion used these facts to support his factual determination that Harry intended to transfer the properties to his sister instead of to his new spouse.

¶7. Harry Green died on July 6, 2010. In 2007, Harry updated his will to devise all of his property to his wife Cristina and his grandchildren. The property listed in the will included the properties Harry deeded to Shirley on December 31, 2003. Because Shirley took control of the properties after Harry's death, Cristina filed a complaint for an accounting of the estate

and a declaratory judgment as to the owner of the property at issue. Cristina argued that the deeds signed on January 15, 2004, were properly accepted by Harry, and the properties were to pass as dictated by Harry's will. The estate was never able to find the unacknowledged original deeds signed on January 15, 2004, and those deeds were never filed in the land records or the clerk's office. Copies of the deeds signed that day were retrieved from Harry's attorney, but there is no record of Shirley ever signing a deed to convey the "Two Houses and Green Valley Lab" back to Harry.

¶8. The chancellor found that, after reviewing all of Harry's actions, he intended for Shirley to possess the properties. As a result, the court found that Shirley was the rightful owner of the eight properties in dispute.[4] Cristina timely appealed the chancellor's decision.

## STANDARD OF REVIEW

¶9. Our review of the chancellor's decision is limited. The findings of a chancery court will not be disturbed "unless the [court] abused its discretion, applied an erroneous legal standard, or its findings are manifestly wrong or clearly erroneous." *Matter of Estate of Smith v. Boolos*, 204 So. 3d 291, 305 (¶22) (Miss. 2016) (citing *In re Estate of Baumgardner*,

---

[4] In the chancellor's original memorandum opinion and judgment filed on November 7, 2017, he found that Shirley was the rightful owner of six properties conveyed on December 31, 2003 (1201 Nixon Avenue, the White Lane property in Monroe County, the Main Street Warehouse in Shannon, the Monroe County land, Temple Circle, and the Shannon Lot). Later, on February 21, 2018, the chancellor entered a order clarifying his memorandum opinion and judgment. In his clarifying order, the chancellor found that the Green Valley Lab property belonged to Shirley. Additionally, he found that Shirley owned the house and 9.5 acres in Plantersville. At the time of this appeal, Shirley was adjudged to be the rightful owner of all eight properties.

82 So. 3d 592, 598 (¶15) (Miss. 2012)). Questions of law, and issues of constructive trusts, we review de novo. *Id*.

## ANALYSIS

¶10. Cristina argues three issues on appeal. Because her first two issues deal with acceptance and delivery of the deeds signed on January 15, 2004, we consider them as one issue. First, Cristina claims that the chancellor erred in awarding all eight properties to Shirley because Harry had properly accepted the deeds signed on January 15, 2004. Second, she argues a constructive trust was created when Shirley took possession of the properties, and the properties should have been distributed as dictated in Harry's will.

¶11. The laws of this State concerning the validity of deeds and the transfer of real property are well settled. For there to be a valid conveyance of real property, there must be delivery and acceptance of a valid deed. *In re Estate of Hardy*, 910 So. 2d 1052, 1054 (¶7) (Miss. 2005). Delivery constitutes a "transfer of [a deed] from the grantor to the grantee or his agent or to some third person for the grantee's use, in such manner as to deprive the grantor of the right to recall it at his option, and with intent to convey title." *Id*. at (¶8) (citing 23 Am. Jur. 2d *Deeds* §120, at 156 (1983)). Before delivery is complete, a deed is "without force or effect and is merely a 'scroll under control of the grantor who is free to withdraw it, destroy it, or complete its execution by delivery.'" *Morrow v. Morrow*, 219 So. 3d 142, 146 (¶13) (Miss. 2013). The Mississippi Supreme Court has found that a deed that was signed and acknowledged, but never delivered, was void for lack of delivery. *Id*. at 1055 (¶8)

6

(citing *Grubbs v. Everett*, 236 Miss. 698, 701, 111 So. 2d 923, 924 (1959)).

¶12. Cristina claims that the chancellor erred in awarding all eight properties to Shirley because Harry had properly accepted the deeds signed on January 15, 2004. She argues that Harry's actions leading up to the conveyance on January 15, 2004 showed his intent was always for the properties to return to him. Harry had the deeds that conveyed the properties from him to Shirley (signed on December 31, 2003) and the deeds that transferred them back (signed on January 15, 2004) created at the same time. Additionally, the short period of time between the conveyances, Cristina argues, makes it clear that Shirley was not the intended owner. The chancellor disagreed, and found that Harry's actions indicated he wanted Shirley to own the properties at issue. For two equally compelling reasons, we find that the chancellor's judgment should be affirmed and that Shirley is the rightful owner of the properties.[5]

¶13. First, the chancellor factually found, after considering the evidence presented at trial, that Harry intended the properties in question to be transferred to Shirley. We are bound to affirm that factual finding unless it was manifestly in error or clearly erroneous. Here, ample evidence supports the chancellor's finding. The chancellor's decision was based on "Harry's words, acts[,] and the circumstances surrounding the transaction." From that, the chancellor

---

[5] The dissent asserts that the majority "primarily relies" on the "new" theory that Harry could not accept the January 2004 deeds because Shirley could not devise what she did not own until December 2004. That statement is contrary to the language in this sentence, where the majority clearly indicates "two equally compelling reasons" to affirm the chancellor.

7

determined Harry "did not intend to, and thus did not accept, the conveyance" of the properties. We agree. Cristina testified at trial that her husband was renting their home at 1201 Nixon Drive:

Q.    -- y'all were renting the Nixon home

A.    Yeah [. . . .]

This was during the time that Shirley was the owner of record for the 1201 Nixon Drive property. Further, testimony proved that Shirley signed for deeds of trust as the owner of the properties, and Shirley re-signed the deed to the Summit property after she had signed it previously on January 15. In addition to all of this, the chancellor heard testimony that the deeds Harry ultimately delivered to Shirley were the warranty deeds he signed on December 31, 2003. The January 15, 2004 deeds were not filed and were, in fact, never found. All of these facts, coupled with the additional testimony and evidence at trial, support the chancellor's factual findings and conclusion of law and do not rise to the level of manifest error or clearly erroneous. We therefore affirm the chancellor's decision in this case.

¶14. Further, equally compelling is the argument by Shirley that she did not have the ability to transfer title on January 15, 2004, since she did not legally own the properties until Harry delivered the December 31, 2003 warranty deeds to her in December 2004.[6] This Court finds

_____

[6] The dissent complains that this argument was first made during oral argument. The dissent argues that this "new theory" should not be ruled upon by this Court. This is not a "new theory" or a new assignment of error but is a question of law. It is new logic applied to the same facts involving the law at issue in this litigation since the beginning—who owns the properties, Harry's intent, and the delivery and acceptance of the deeds in question. This

that Shirley was unable to legally perfect the January 15, 2004 conveyance because she did not have title on that date. When Harry signed the original December 31, 2003 deeds, his conveyance to Shirley was not complete until he delivered those deeds on December 3, 2004.

¶15.    Conveyances of real property require both delivery and acceptance of a valid deed for that conveyance to have legal effect. *In re Estate of Hardy*, 910 So. 2d 1052, 1054 (¶7) (Miss. 2005). Delivery constitutes a "transfer of [a deed] from the grantor to the grantee or his agent or to some third person for the grantee's use, in such manner as to deprive the grantor of the right to recall it at his option, and with intent to convey title." *Id*. at (¶8) (citing 23 Am. Jur. 2d *Deeds* § 120, at 156 (1983)). Pursuant to this law, Shirley's deeds dated January 15, 2004 to Harry were never valid. She had no ownership interest to transfer on that date, because Harry had not yet delivered the December 31, 2003 deeds to her which gave her an ownership interest. While the chancellor did not specifically find this, this Court has the authority, and indeed the mandate, to decide cases based on the law and not just what was presented to us by the attorneys.

¶16.    The supreme court and this Court have held numerous times that appellate courts may "affirm a chancellor's decision that reached the right result but for the wrong reason." *Timms v. Pearson*, 876 So. 2d 1083, 1086 (¶12) (Miss. Ct. App. 2004). *See also Cummings v. Goolsby*, 255 So. 3d 1257, 1258 (¶8) (Miss. 2018). Therefore, following that precedent and

---

was merely an alternative argument put forth during oral argument on a question of law central to the issues in this litigation.

logic, we affirm the decision of the chancellor based on new logic applied to the facts of this case. The chancellor's findings of fact as to Harry's intent are supported by the evidence. The law requiring delivery and acceptance before a conveyance is legally effective supports the chancellor's conclusions.

¶17. The dissent applies the doctrine of after acquired title in an effort to preclude the argument made by Shirley's counsel on appeal. The dissent would find that the chancellor was manifestly wrong when he found that Shirley owned the properties. The dissent argues that the January 15, 2004 transfer from Shirley to Harry became valid once Harry delivered the December 31, 2003 deeds to Shirley on December 3, 2004 as a result of the after acquired title doctrine. The doctrine of after acquired title provides:

> Where a grantor who has no title, whose title is defective, or whose estate is less than that which he assumes to pass, conveys by warranty or covenants of like import and subsequently acquires the title or estate which he purports to convey, or perfects his title, such after-acquired or perfected title will inure to the grantee, or to his benefit, by way of estoppel.

*Turner v. Miller*, 276 So. 2d 690, 693 (Miss. 1973). The dissent claims that this doctrine fits "this case perfectly" and, makes the chancellor's judgment clearly erroneous. We disagree.

¶18. The doctrine of after acquired title derives from the principles of equitable estoppel. *Crooker v. Hollingsworth*, 210 Miss. 636, 642, 46 So. 2d 541, 544 (1950). The doctrine prevents harm to the grantee who, in theory, paid consideration for property they thought they were buying from a grantor. If it turns out that the owner did, in fact, not own the property at the time of the sale, but later acquires that property, the title is then vested to the grantee.

10

The courts, however, "will not give effect to estoppel where the parties are equally well informed as to the essential facts, or where the means of knowledge were equally open to them." *Id*. (citing 19 Am. Jur., p. 742). Additionally, "a party who invokes [the doctrine] must have lost something or [been] placed at some disadvantage by the conduct of the other party." *Id*. Cristina would have to show that somehow Harry lost something or was placed at disadvantage and that she should therefore own the properties by invoking the equitable estoppel doctrine on his behalf. It is hard to imagine how Harry was taken advantage of, or was not aware of everything going on in these transactions, when he orchestrated and caused every move.

¶19. As with many aspects of the law, the equitable estoppel of after acquired title doctrine has several exceptions, some of which directly control in this case. Three such exceptions are as follows:

(1) When a quitclaim deed conveys only the grantor's present interest, it does not convey any after acquired title;[7]

(2) When a grantee knew of the deficiencies in the grantor's title, no after acquired title is conveyed;[8]

(3) The doctrine will not be applied where the parties are equally well informed as to essential facts, or the means of knowledge were equally open to them.[9]

---

[7] *McLaurin v. Royalties Inc.,* 231 Miss. 240, 95 So. 2d 105 (1957).

[8] *Crooker v. Hollingsworth*, 210 Miss. 636, 46 So. 2d 541 (1950).

[9] *Buchanan v. Stinson*, 335 So. 2d 912, 914 (Miss. 1976).

11

All three of these exceptions apply in this case.

¶20.   First, the transfer of the Plantersville property was by quitclaim deed and not a warranty deed.  Second, Harry was certainly aware that Shirley's title which was the subject of the January 15, 2004 deeds was deficient.  Harry never delivered the original December 31, 2003 deeds to Shirley as required by law.  He caused the deficiency.  Therefore, if Harry knew of that deficiency since he never delivered the deeds to Shirley, then he cannot claim, through Cristina, the after acquired title doctrine.  Finally, as to the "equally well informed" exception, the record indicates that Harry was intricately involved in every aspect of the transfers and orchestrated each and every step.  He originally had his attorney make the December 31, 2003 deeds, he signed those deeds and had them dully notarized, and then took the deeds with him.  Still in possession of those deeds, he had Shirley sign a completely identical set of deeds conveying the December 31 properties back to him.  Those deeds were not notarized, and he took those deeds with him as well.  Further, Harry was the original grantor in the December 31, 2003 deeds and the grantee of the January 15, 2004 deeds and held in his possession both sets of deeds.  Cristina, party to neither set of deeds, was never a grantor or grantee and should not be allowed to claim an equitable estoppel doctrine  in an attempt to claim title to properties that she bought from no one.  The chancellor factually found Harry had intended to transfer to Shirley.

¶21.   The equitable estoppel doctrine was not designed for such purposes but rather to transfer ownership when a grantor (in January 2004—that would be Shirley) purports to sell

12

an interest to an uninformed grantee (Harry) and later obtains title that is not owned at the time of the sale but later is obtained. Harry was acting as both grantor and grantee over the course of these transactions and had full knowledge of the actual ownership interest of all parties, including the deficiencies in Shirley's title, and he actually authorized and facilitated both transactions. There is simply no way he was not equally well informed. To the contrary, his actions, as found by the chancellor, showed he was very well informed. Harry never filed the January 15, 2004 deeds that Cristina attempts to use as a basis for her ownership. He filed the deeds conveying the land in question to Shirley. Further, he delivered the original December 31, 2003 deeds (nine months after holding both sets of deeds), which the chancellor found not only completed his conveyance to Shirley, on December 3, 2004, but also was indicative of his intent in these transactions. The dissent's argument of after acquired title was never raised by the parties and simply does not apply to the facts of this case and the clearly set forth exceptions under Mississippi law.

¶22. As to Cristina's second issue, we decline to consider whether the trial court erred in not imposing a constructive trust. A constructive trust is "a judicially imposed remedy used to prevent unjust enrichment when one party wrongfully retains title to property." *Presbytery of St. Andrew v. First Presbyterian Church PCUSA of Starkville*, 240 So. 3d 399, 405 (¶27) (Miss. 2018). Because we find that the chancellor was not in error in finding Shirley was the rightful owner of the properties in question, Cristina's argument as to a constructive trust is moot. For these reasons, we affirm the decision of the chancellor.

13

¶23. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY TINDELL, J.**

**J. WILSON, P.J., DISSENTING:**

¶24. This dissent primarily addresses six of the eight properties that are at issue in this appeal.[10] There is no dispute that Shirley signed warranty deeds reconveying those six properties to Harry. There is also no dispute that Shirley signed those deeds at Harry's lawyer's office at Harry's specific request. And there is no dispute that Harry took possession of the deeds, continued to pay insurance and taxes on the properties for the rest of his life, and continued to make improvements and repairs and collect rents on the properties. The chancellor nonetheless found that Harry did not "accept" the deeds to these properties. I respectfully disagree with the chancellor's conclusion. I would reverse and render judgment in favor of Cristina as to these six properties.

## I. The January 15, 2004 Warranty Deeds

¶25. With respect to six of the properties at issue in this appeal, there is no dispute (a) that Harry signed deeds conveying the properties to Shirley on December 31, 2003, and (b) that Shirley then signed warranty deeds reconveying the properties to Harry on January 15, 2004.

---

[10] The other two properties—(1) the "Two Houses and Green Valley Lab" in Shannon and (2) a house and nine and a half acres in Plantersville—raise different issues because there is no evidence that Shirley signed deeds reconveying them to Harry. I address those two properties in Part II.

14

These include four properties in Lee County and two in Monroe County:

1.    1201 Nixon Drive in the Lee Acres subdivision in Tupelo (Lee County) (Exhibits 1-A and 1-B);

2.    the "Main Street Warehouse" in Shannon (Lee County) (Exhibits 2-A and 2-B);

3.    the "Shannon Lot" in Shannon (Lee County) (Exhibits 4-A and 4-B);

4.    "Temple Circle" in Shannon (Lee County) (Exhibits 5-A and 5-B);

5.    "Monroe County Land" in or around Nettleton (Monroe County) (Exhibits 3-A and 3-B); and

6.    a beauty shop, house, and acreage at 30023 White Lane in Nettleton (Monroe County) (Exhibits 6-A and 6-B).

Shirley signed the six deeds reconveying the properties to Harry at Harry's specific request at the office of Harry's lawyer, John Fox.

¶26.   The December 31, 2003 deeds for the four Lee County properties were not recorded until December 4, 2004. The December 31, 2003 deeds for the two Monroe County properties were not recorded until after Harry's death. On July 29, 2010, about three weeks after Harry died, Shirley recorded those two deeds in Monroe County. The January 15, 2004 deeds reconveying the six properties from Shirley to Harry were never recorded.

¶27.   Although the deeds reconveying the properties from Shirley to Harry were neither acknowledged nor recorded, that does not affect their validity as between Shirley and Harry or their heirs. Miss. Code Ann. § 89-5-3 (Supp. 2018) (providing that a deed "shall . . . be valid and binding" "as between the parties and their heirs" even if it is not acknowledged or

15

recorded); *Assocs. Fin. Servs. Co. of Miss. v. Bennett*, 611 So. 2d 973, 976 (Miss. 1992); *Cotton v. McConnell*, 435 So. 2d 683, 687 (Miss. 1983); *Metro. Nat'l Bank v. United States*, 901 F.2d 1297, 1302 n.2 (5th Cir. 1990). The chancellor recognized this point in his order denying summary judgment, and Shirley does not dispute it on appeal. The chancellor correctly stated that the "one central question remaining in this cause" is "whether Harry accepted the six deeds on January 15, 2004."

¶28. "[A]cceptance by the grantee [is] essential to the validity of a deed." *Odom v. Forbes*, 500 So. 2d 997, 1001 (Miss. 1987). The grantee's intent to accept the deed is "manifested by his words, acts and the circumstances surrounding the transaction." *Id.* The chancellor in this case noted that Mississippi case law addressing the grantee's intent to accept a deed is "sparse."

¶29. In *Martin v. Adams*, 216 Miss. 270, 62 So. 2d 328 (1953), the Court held that the grantee, Mrs. Adams, did not accept a deed from the grantor, her husband. When Mr. Adams told his wife that he had executed a deed conveying certain land to her, she "immediately declined to accept the deed, and remonstrated with him for what he had done." *Id.* at 277, 62 So. 2d at 329. She "took the deed to an attorney for his interpretation of it," but the deed was then "returned to [Mr. Adams] and remained in his control." *Id.* at 277-78, 62 So. 2d at 329. The Court held that the deed was void due to Mrs. Adams's express refusal to accept it. *Id.*

¶30. The Court also held that deeds were not accepted in *In re Estate of Hardy*, 910 So. 2d

16

1052, 1054-55 (¶¶7-10) (Miss. 2005). In that case, Hardy executed deeds conveying property to her three daughters, but she died before she delivered the deeds. *Id.* at 1055 (¶9). The deeds were found in her purse after her death, and "each of [her daughters] testified unequivocally that she never accepted the deed." *Id.* Thus, the problem in *Hardy* was not just that the deeds were not "accepted" but that they were not even delivered. *Id.* at (¶10).

¶31. In *Salmon v. Thompson*, 391 So. 2d 984 (Miss. 1980), the Court held that a deed was not accepted because the offeree failed to pay the purchase price for the property. Salmon orally agreed to buy 55 acres from Thompson for a specified price. *Id.* at 985. Six months later, Thompson wrote to Salmon. *Id.* He enclosed an executed deed and instructed Salmon to return a copy of the deed with a check for the purchase price if he still wanted to buy the property. *Id.* For more than two years thereafter, Salmon did not pay for the property or record the deed, and Thompson finally informed Salmon that he was selling the land to another party. *Id.* at 985-86. Salmon then attempted to record the deed and pay for the property. *Id.* However, the Court held that Thompson had withdrawn the offer to sell before Salmon accepted the deed. *Id.* at 987. The Court held that Thompson's initial "letter with instructions . . . constituted a qualified delivery of the deed," but Salmon failed to accept the deed when he failed to comply with those instructions for more than two years. *Id.*

¶32. In each of the foregoing cases, the evidence that the grantee did not accept the deed was clear. There is no similarly clear evidence of non-acceptance in this case. In fact, there is ample evidence that Harry did accept the deeds. There is no dispute that Harry asked

17

Shirley to go to the Fox law office and sign the deeds reconveying the properties to him. There is also no dispute that Harry took possession of the deeds and left the Fox law office with them. Harry then continued to pay the taxes and insurance on the properties, continued to make repairs and improvements on the properties, and continued to collect rent on the properties. In addition, more than three years later, Harry had a new will prepared in which he specifically devised at least some of the properties at issue. He specifically devised the "White Lane" property in Nettleton to his grandchildren, and he devised "[t]he Green real estate apartments and houses" to Cristina.[11] In a residual clause, Harry devised all of his remaining real property to Cristina. Harry also borrowed money against the Nixon Drive property and used the funds to build a new marital home on another of his properties. In short, with respect to these six properties, Harry exercised the ordinary rights and fulfilled the ordinary obligations of property ownership. As the chancellor put it, "Harry's day-to-day behavior with regard to the property was consistent with ownership."

¶33.   The evidence that Shirley cites does not demonstrate a lack of acceptance. Shirley emphasizes that Harry never had the deeds notarized and filed. However, as discussed above, that does not render the deeds invalid as between the parties or their heirs.[12] Shirley

---

[11] The precise nature of all six of the properties is not clear from the record; however, at least some of them are rental properties that appear to fall within this devise. Shirley acknowledged at trial that she changed the locks on the properties and began collecting rent on the properties after Harry's death.

[12] Moreover, as noted above, with respect to the two Monroe County properties, neither the December 31, 2003 deeds from Harry to Shirley nor the January 15, 2004 deeds from Shirley to Harry were recorded prior to Harry's death. It was only after Harry died that

18

also notes that Harry asked her to sign deeds of trust for the Nixon Drive property. However, it is hardly surprising that the bank wanted Shirley—the record owner of the property—to sign the deed of trust. Shirley next points out that Harry frequently reviewed the properties under her name at the Lee County chancery clerk's office. However, that simply shows that Harry knew that the Lee County land records showed that Shirley was the owner of record, which is not in dispute.

¶34. Shirley also relies on Cristina's inability to produce the original signed deeds that Harry took with him from the Fox law office. Shirley speculates that Harry may have lost or destroyed the originals. However, even if that is what happened, the subsequent loss or destruction of the originals would not render Harry's acceptance of the deeds invalid. *See Wood v. Johnson*, 234 Miss. 874, 880, 108 So. 2d 202, 204 (1959) ("The rule has generally been adhered to in this jurisdiction that where a deed has once been signed and delivered, a subsequent surrender and destruction of it does not divest the grantee of title to the land."); *Lisloff v. Hart*, 25 Miss. 245, 250 (1852) ("The deed made to the son by Hanah vested the title to the land in him, and the subsequent destruction of it did not divest it. The second deed, made by Hanah to Charles Lisloff, Sen., is inoperative, and cannot defeat the right of the son to the premises."). The relevant issue is whether Harry accepted the deeds when they were executed and delivered to him in January 2004—not what he may have done with them

___

Shirley recorded her deeds. It is unclear why Shirley's unilateral action after Harry's death should make those deeds more valid than the deeds that Shirley signed to reconvey the same properties to Harry.

19

sometime later.

¶35. Shirley also cites vague testimony of her brother, Wilford Green, that Harry and Cristina wrote a number of "rent" checks to Larry Williams for "around $500" while the couple resided on Nixon Drive. Wilford said that Williams was a "friend" of theirs. Shirley suggests that Harry would not have paid "rent" to a "third party" if he really owned the Nixon Drive property. The suggestion makes no sense. To begin with, Wilford had little knowledge of the checks and did not clearly testify that they were rental payments for the Nixon Drive home. Beyond that, there is no evidence that Larry Williams owned the property or that he was collecting rent on behalf Shirley. It is Shirley's position in this litigation that *she* owned the Nixon Drive property at that time. Yet Shirley fails to explain why Harry would have been paying rent to Larry Williams or how that would tend to prove that she owned the property. Is Shirley suggesting that Harry mistakenly believed that his friend Larry Williams owned the property? And, if so, what would that prove?[13]

¶36. Finally, the chancellor found it significant that Harry had Shirley execute two deeds reconveying the marital home in "The Summit" subdivision in Tupelo. The Summit property

---

[13] The majority opinion quotes a snippet of Cristina's testimony to make it appear that Cristina admitted that she and her husband were renting the Nixon Drive home. *Ante* at ¶13. Cristina, who is from Venezuela, apologized during her testimony that her "English is so bad." She also testified that she and Harry did not pay rent for the property and that they did not have a landlord. All that she clearly articulated was that she once overheard Harry make some unspecified comment to his secretary about renting the property. Furthermore, the majority also fails to explain why Harry or Cristina would have been paying rent to *Larry Williams* if, as the majority contends, *Shirley* owned the property.

20

is not at issue in this appeal because Shirley does not dispute that Cristina is its rightful owner. Like the six properties discussed above, Harry signed a deed conveying the Summit property to Shirley on December 31, 2003, and Shirley then signed a deed conveying the property back to Harry on January 15, 2004, although the latter deed was never recorded. In 2009, Harry asked Shirley to execute a second deed conveying the Summit property to him so that he could file for a homestead exemption on the property. Shirley complied, and that deed was both acknowledged and recorded. The chancellor suggested that the 2009 deed "may have been unnecessary if Harry had truly accepted the 2004 conveyance." However, the much simpler explanation for Harry's request for a second deed is just what he told Shirley: he needed an acknowledged, recorded deed to file for his homestead exemption.[14] Harry's request regarding the Summit property should not be interpreted as evidence of what he did or did not believe about the six other properties.

¶37.    In summary, the chancellor was entirely correct in finding that "Harry's day-to-day behavior with regard to the property was consistent with ownership." Harry asked Shirley to sign deeds reconveying the properties to him, and he took possession of those deeds. He also paid the taxes and insurance on the properties, he made improvements and repairs, he

---

[14] *See* Miss. Code Ann. § 27-33-17(f) (Rev. 2017) ("If title is held by deed . . . , such instrument shall be dated and acknowledged on or before January 1 of the year for which homestead exemption is applied and shall be filed for record with the chancery clerk on or before January 7 of the year for which homestead exemption is applied . . . ."); Miss. Code Ann. § 89-3-1 (Supp. 2018) ("Unless [a deed] is [properly] acknowledged . . . , the [chancery clerk] may refuse to [record the deed].").

collected rent, and he even devised the properties in his will. The various other pieces of evidence cited by Shirley do not prove a lack of acceptance. Because Harry accepted the deeds, I would reverse and render judgment in favor of Cristina.

## II. Constructive Trust

¶38. Cristina's complaint sought a constructive trust as to all eight properties that are in dispute in this appeal. As to the six properties discussed above in Part I, Cristina makes an in-the-alternative argument that, "[t]o the extent there is any question concerning [Harry's] acceptance of the six signed deeds, [the] evidence is sufficient to establish a constructive trust as to the properties." Cristina also argues that a constructive trust should be imposed on two additional properties: (1) the "Two Houses and Green Valley Lab" in Shannon and (2) a house and nine and a half acres in Plantersville. There are no deeds to show that Shirley ever conveyed these properties back to Harry; however, Cristina argues that Shirley held the properties "solely for the benefit of Harry."

¶39. A constructive trust is an equitable claim *against* a party who holds legal title to a property. *Joel v. Joel*, 43 So. 3d 424, 431 (¶23) (Miss. 2010); *McNeil v. Hester*, 753 So. 2d 1057, 1064 (¶24) (Miss. 2000). Therefore, the majority's determination that Shirley has title to the six properties discussed above in Part I does not defeat Cristina's claim for a constructive trust. Nor is Cristina's lack of deeds for the other two properties dispositive with respect to those two properties.

¶40. I would not address Cristina's claim for a constructive trust as to the six properties

22

discussed above in Part I only because I would hold that the January 15, 2004 warranty deeds from Shirley to Harry were valid and effectively conveyed title to the properties. Therefore, a constructive trust should be unnecessary as to those properties.

¶41. As to the remaining two properties—the Two Houses and Green Valley Lab and the Plantersville property—I would affirm the chancellor's denial of a constructive trust.[15] Unlike the six properties discussed above, there is no evidence that Shirley signed a warranty deed conveying either of those properties back to Harry. Although there is some evidence to support Cristina's claim that Shirley held the properties solely for Harry's benefit, the evidence is also open to other interpretations. I cannot say that the chancellor clearly erred by finding that Cristina failed to meet her burden of proving this claim by clear and convincing evidence.

## CONCLUSION

¶42. I would affirm the denial of Cristina's claim for a constructive trust with respect to the Two Houses and Green Valley Lab and the Plantersville property. However, with respect to the six properties discussed in Part I, I would hold that the evidence is open to only one interpretation: Harry accepted the signed warranty deeds reconveying the properties to him. Therefore, those deeds were valid and effective, and I would reverse and render as to those six properties. I respectfully dissent.

---

[15] The Supreme Court's decision in *Joel*, 43 So. 3d at 430-31 (¶¶22-24), summarizes the basics of the law on constructive trusts.

23

**TINDELL, J., JOINS THIS OPINION.**