# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01282-COA

IN RE THE AARON STAPP LIVING TRUST:                          APPELLANT
TROY STAPP

v.

AMY STAPP                                                              APPELLEE

DATE OF JUDGMENT:               08/03/2020
TRIAL JUDGE:                    HON. MITCHELL M. LUNDY JR.
COURT FROM WHICH APPEALED:      PANOLA COUNTY CHANCERY COURT,
                                FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:         TAYLOR D. BUNTIN III
ATTORNEYS FOR APPELLEE:         A. E. (RUSTY) HARLOW JR.
                                KATHI CRESTMAN WILSON
                                MORGAN KAY JACKSON
NATURE OF THE CASE:             CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                    AFFIRMED - 05/31/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.

### EMFINGER, J., FOR THE COURT:

¶1.    Aaron Stapp operated a successful cattle farm in Panola County for several years. On December 17, 2009, he and his wife, Bobbie Stapp, created the Stapp Revocable Living Trust and placed certain assets into the trust. On May 28, 2015, Aaron Stapp then created the Aaron Stapp Living Trust and, again, placed certain assets into this trust.[1] A quitclaim deed,

---

[1] There were no trust documents admitted into evidence in this case. There is no inventory of assets for either trust and no annual reports for either trust. While there was some discussion during the trial that the trusts may have been merged, there is no evidence in the record of that fact.

that was introduced into evidence at trial, indicated that the farmland at issue in this appeal was first conveyed by Aaron T. Stapp and Bobbie N. Stapp to Aaron Stapp and Bobbie Stapp as Trustees of the Stapp Revocable Living Trust on December 17, 2009. The farmland was then conveyed by Aaron Stapp as Trustee of the Stapp Revocable Living Trust to Aaron Stapp as Trustee of the Aaron Stapp Living Trust on May 28, 2015. It would appear that Bobbie Stapp was deceased at the time of the latter conveyance, although there is no specific reference to her death in the record on appeal.

¶2.    Aaron Stapp died on October 21, 2016. His last will and testament was probated, and his estate was opened on January 17, 2017, with Amy Stapp and Troy Stapp, his only children and the parties here, serving as co-executors. Amy and Troy also became trustees of both trusts at some point after their father's death. The estate was closed on November 30, 2018. On July 10, 2019, Troy was removed as a trustee of the two trusts, leaving Amy as the sole trustee. On September 27, 2019, Amy was removed as trustee, and attorney John T. Lamar was appointed as trustee by the chancery court.[2]

---

[2] The agreed order appointing Lamar as the trustee for "both trusts," stated in part:

> The Honorable John Lamar is hereby appointed as sole Trustee for both Trusts in this action. **As it is the desire of both beneficiaries of the Trust** to do so, the Trustee, in addition to any other duties and responsibilities, **shall evaluate the propriety and potential for dissolving both Trusts pursuant to their terms**.

(Emphasis added). Lamar was not a named party in this action, nor did he testify at trial. We have no record or other account of actions he may have taken as trustee. We have no evidence of Lamar's opinion as to whether the continuance of the trust was necessary to achieve any material purpose of the trusts. *See* Miss. Code Ann. § 91-8-411(b) (Rev. 2018). That being said, Lamar was clearly aware of the litigation because his invoice for services rendered to the trusts was admitted into evidence at trial. Considering the direction he was

¶3.     On April 20, 2020, Amy filed a petition in the Chancery Court of Panola County, Mississippi, asking the court to divide the corpus of the Aaron Stapp Living Trust or, in the alternative, to make a distribution to the beneficiaries. The petition alleges that Amy and her brother, Troy, are the only beneficiaries of the trust.[3] Troy filed an answer and a counter-petition on June 1, 2020. In his answer, Troy denied that the relief Amy requested should be granted. In his counter-petition, Troy claimed that he should be reimbursed for certain expenses he incurred on behalf of the trust and that Amy should be required to reimburse the trust for her use of trust assets for her own benefit and for expenses the trust had incurred or the income it had lost as a result of Amy's use of trust assets. While Troy agreed that the brokerage accounts should be divided after being adjusted as suggested in his counter-petition, he argued that the farmland should not be sold, and should remain a trust asset.

given by the court in the order appointing him as trustee, it is significant to note that Lamar, as trustee, did not interpose any objection to the modification or termination of the trusts and did not notify the chancellor of any additional beneficiaries or interested parties. In fact, Lamar signed the chancery court's final order distributing the assets to the two beneficiaries of the trust, Amy and Troy.

[3] The dissent questions how the chancellor could determine who the beneficiaries of the trust were without having the trust documents. First, the parties agreed in the pleadings that they were the only beneficiaries of the trust. Second, we agree with the dissent that the trustee had a fiduciary duty to make the court aware of and protect the interest of any other beneficiary of the trust. However, as noted above, Lamar did not identify any other beneficiary. Third, the chancellor here is the same chancellor that presided over the probate of the estate of Aaron Stapp. The record is clear that the chancellor was familiar with the trust documents. In an agreed order from the estate file that was introduced as an exhibit, the chancellor quoted "Section 6.01 of the Living Trust." That section ordered the distribution of a house in Cordova, Mississippi, to Amy Stapp and further provided, "If Amy Stapp is deceased, my Trustee shall distribute this property to Amy Stapp's descendants, *per stirpes*." This provision related to a specific asset and was not merely a general reference to the remainder of the trust assets. Obviously, Amy Stapp was not deceased, and there are no other beneficiaries of the trust other than Troy.

¶4. These matters went to trial on June 24, 2020. Subsequently, the chancery court entered an order on August 3, 2020, resolving the matters presented. On August 12, 2020, Troy filed a "Motion to Amend and/or Clarify Judgment." On August 13, 2020, Amy also filed a "Motion to Clarify, Amend, and Reconsider." After considering both motions, the chancery court entered an additional order on October 28, 2020, which clarified that "all liquid assets shall be divided between the two beneficiaries prior to the auction of the remaining assets of the trust." All the additional requests contained in Amy's and Troy's motions were denied. The chancellor did not order that the farmland and houses be sold, and they remain assets of the trust. Aggrieved by portions of the chancellor's ruling, Troy appeals.

## STANDARD OF REVIEW

¶5. "This Court employs a limited standard of review on appeals from chancery court." *In re Est. of Baumgardner*, 82 So. 3d 592, 598 (¶15) (Miss. 2012).

> [T]his Court "will not disturb the factual findings of a chancellor when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, [or his findings were clearly erroneous[,] or [he] applied an erroneous legal standard."

*Id*. (quoting *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007)). "Questions of law are reviewed de novo." *Id*. (citing *Corp. Mgmt. Inc. v. Greene County*, 23 So. 3d 454, 459 (¶11) (Miss. 2009)).

## ANALYSIS

¶6. Troy raises several issues on appeal regarding the chancery court's order to sell and divide certain trust assets, as well as the disposition and reimbursement of other specific trust

4

assets and expenses. Troy argues that the chancellor's ruling was not supported by substantial, credible, and reasonable evidence and was against the overwhelming weight of the evidence.

¶7. The chancellor's authority to modify or terminate a trust is established by statute. More specifically, Mississippi Code Annotated section 91-8-105 (a)-(b) (Rev. 2018) states in part:

> Except as otherwise provided in the terms of the trust, this chapter governs the duties and powers of a trustee or any other fiduciary under this chapter, relations among trustees and such other fiduciaries, and the rights and interests of a beneficiary. . . . The terms of a trust prevail over any provision of this chapter **except**: . . . (4) **The power of the court to modify or terminate a trust** under Sections 91-8-410 through 91-8-416[.]

(Emphasis added). Further, Mississippi Code Annotated section 91-8-411 states in part:

> (b) Following the settlor's death, a noncharitable irrevocable **trust may be terminated upon consent of all the qualified beneficiaries if the court concludes that continuance of the trust is not necessary to achieve any material purpose of the trust**. . . .
>
> (c) Upon termination of a trust under subsection (a) or (b), the trustee shall distribute the trust property **as agreed by the qualified beneficiaries**.
>
> (d) **If not all of the qualified beneficiaries consent** to a proposed modification or termination of the trust under subsection (a) or (b), **the modification or termination may be approved by the court if the court is satisfied that**:
>
>> (1) If all of the qualified beneficiaries had consented, the trust could have been modified or terminated under this section; and
>>
>> (2) The interests of a qualified beneficiary who does not consent will be adequately protected.

(Emphasis added).[4]

¶8.     In this case, the chancery court did not issue written findings of fact or conclusions of law.  Neither Amy nor Troy requested before trial, after trial, or after the chancellor's ruling that the chancellor issue written findings of fact or conclusions of law.  In *Thomas v. Thomas*, 281 So. 3d 1191, 1213 (¶79) (Miss. Ct. App. 2019), this Court held that "when there are no specific findings of fact, this Court will assume that the trial court made determinations of fact sufficient to support its judgment."  We must then assume that the chancellor made the necessary findings, pursuant to the above statutes, that gave him the authority to modify the trusts.

¶9.     The chancery court was not provided with sufficient evidence that would allow the court to make an in-kind distribution of the trust's real property.  Amy and Troy had differing opinions as to how the real property should or could be equitably divided.  Troy did testify, however, that he believed an equitable in-kind distribution could be reached after all other issues were resolved.  In turn, the chancery court left the real property in the trust while ruling on the disposition, management, and reimbursement of the remaining trust assets.  Troy's arguments asserted on appeal stem from the chancery court's ruling on the disposition, management, and reimbursement of those remaining trust assets.

## I.      Did the chancery court err in requiring that all the farm equipment be auctioned?

---

[4] These statutes are part of the Mississippi Uniform Trust Code, which was enacted by the Legislature and became effective on July 1, 2014.  While the dissent may be rightly concerned with the absence of the trust documents, the language in the trust documents could not have limited the chancellor's authority to modify or terminate the trusts pursuant to these statutes.

¶10. Troy argues on appeal that the chancellor "afforded no reason for the sale of the [farm] equipment and the facts do not justify that decision." Troy further argues that neither he nor Amy requested that the farm be sold. Troy asserts that the cattle farm was once profitable for his father, and it was capable of being profitable in the future; he suggested a future plan of "backgrounding steers," rather than calves. Finally, Troy argues that even if the farming operation were discontinued, the equipment is necessary for the upkeep and maintenance of the property.

¶11. We will first address Troy's assertion that neither he nor Amy requested that the farm be sold. In paragraph 1 of Amy's petition, she stated that "[t]he Aaron Stapp Living Trust was created by Aaron Stapp on or about May 28, 2015." Paragraph 3 of her petition states that "[t]he parties have been unable to reach an amicable resolution." Paragraph 4 of the petition requests "that this Court divide the corpus of the Trust, or in the alternative, make a distribution to the beneficiaries." Amy's petition clearly requests a division of the entire corpus of the trust and more specifically the corpus of the trust created on May 28, 2015. As shown by the quitclaim deed mentioned above, Troy agreed that the farmland was part of the corpus of the 2015 trust. Amy's petition undoubtedly placed the matter of the disposition of the farm property before the chancery court.

¶12. While Troy argues that the farm had been profitable for his father and could be profitable in the future, the testimony showed that the farm had not made a profit since Aaron Stapp's death. Since their father's death, the trust had benefitted from the sale of several cows; however, up to fifteen cows died due to neglect. Both Amy and Troy had been

7

afforded the opportunity to manage the farm for periods of more than a year each, but they were not really successful in maintaining a working farm. From the testimony, it did not appear that either Amy or Troy had the time, ability, or inclination to manage a working farm on a daily basis. Prior to trial, no efforts had been made by anyone to rent the land to a third party.

¶13.     In *In re Hart's Estate*, 260 Miss. 498, 40 So. 2d 263, 265 (1949), the supreme court held that

> **[a] court of equity** will not order the sale of trust property and the reinvestment of its proceeds merely for the purpose of increasing the value of the trust estate, but **will order such a sale** and reinvestment when so to do is necessary in order to effectuate the purpose for which the trust was created or **to prevent the loss or destruction of the trust estate**.

(Emphasis added). "Courts of equity have **inherent power to protect trusts** and may order a sale of part of the trust property, if such action is necessary for execution of the trust purposes." *Hengen v. Perpetual Care Cemeteries Inc.*, 230 So. 2d 795, 798 (Miss. 1970) (emphasis added). In the case at hand, the chancery court stated in its opinion:

> As this [c]ourt has seen numerous times in the past [t]rusts such as this often are "real world" unworkable and end up being a constant drain on the assets of the trust as well as a constant source of aggravation for the [b]eneficiaries as well as costly (i.e. attorney's fees and trustee fees).

In summary, Troy and Amy showed that they were unable to work together or separately to run the farm. Further, the farm had not been profitable since their father's death, and up to fifteen cows had died in the interim. Therefore, this Court finds no error in the chancery court's decision that the cattle and all the farm equipment would be sold at auction.

**II.     Did the chancery court err in requiring that $50,000 be maintained**

**in an account for unforeseen expenses, taxes, and insurance?**

¶14. Troy argues that the chancery court's requirement for $50,000 to be maintained in an account for unforeseen expenses, taxes, and insurance on the farm property was not necessary in light of the court's requirement that Amy be responsible for all expenses, taxes, and insurance on the same property. While Troy argues that these two provisions are duplicative, there is a key distinction between the two. While the court stated that Amy should be responsible for expenses, taxes, and insurance associated with the farmhouse, the court also stated that the $50,000 should be maintained to cover any **unforeseen** expenses, taxes, and insurance. Understandably, Amy should be required to pay for expenses, taxes, and insurance associated with the farmhouse while she is enjoying the day-to-day use of the home. However, the $50,000 set aside by the chancery court seemed to be set up for a different category of expenses outside of the day-to-day variety. While the real property remains in the trust, we find no error in the chancery court's order regarding the maintenance of an account containing $50,000 for unforeseen expenses related to the farm property.[5]

**III. Did the chancery court err in failing to require Amy to reimburse the trust for rent and increased utility costs during her occupancy of the farmhouse, and did the chancery court err in allowing Amy to remain living in the farmhouse indefinitely?**

¶15. Troy argues on appeal that the chancery court erred by not determining a fair rent

---

[5] The dissent raises several questions concerning this ruling by the chancellor. It is important to understand that the chancellor did not terminate the trusts. While the chancellor's order modifies the trusts by distributing some of the trusts' assets, the land and houses remain in the trusts, along with any other assets not distributed by the court's order. This $50,000 remains in the trust account. Lamar remains the trustee and is responsible for the continued administration of the trusts and trust assets.

amount for the farmhouse and failing to require Amy to reimburse the trust for rent and utility costs for the time that she lived there. He further argues that the chancery court erred in allowing Amy to remain living in the farmhouse rent-free for an indefinite period. Troy combined his argument of these two issues in his brief, and therefore this Court will address them together. Troy argues that he has been denied fair use of the trust property since Amy has been living in the farmhouse and will continue to be denied use as long as she is allowed to remain there.

¶16. It is clear, however, that after his father's death, Troy never lived on the farm. During the approximately seventeen-month period Troy claims he was regularly working the farm, he commuted from his home (about 128 miles roundtrip). Again, after Aaron Stapp's death, no one attempted to rent the land to earn income for the trust. While there is some discrepancy between the parties as to when Amy moved into the farmhouse full-time, she had been living there at least since July 2018. As of the date of the trial, Amy, along with a friend and her children, were still living in the farmhouse.

¶17. In *Reedy v. Johnson's Estate*, 200 Miss. 205, 26 So. 2d 685, 687 (1946), the Mississippi Supreme Court held:

> A court, in determining whether or not it will authorize a departure from the terms of the trust . . . [,] will emphasize the ultimate intention of the trustor rather than the interests of the beneficiaries, and the **prime consideration is the necessity for the preservation of the estate**, and not merely the administration of the trust in a way to produce a greater benefit for the beneficiaries.

(Emphasis added). There is no indication that the farmhouse property was ever intended to or used to generate rental income; however, Amy's use of the farm is not unfettered. The

10

chancery court put conditions on Amy remaining in the farmhouse in furtherance of preserving the trust asset. The chancery court stated, "Amy may continue to live in the farmhouse as long as all expenses are paid and the farmhouse is kept in good condition and she shall pay all the taxes and insurance thereon." Clearly, the chancery court ordered these conditions be met to preserve the trust asset, and if not fulfilled by Amy, provided an avenue for her removal from the property. Although the chancery court order allowed Amy to remain living on the farm, the court did not exclude Troy from enjoying the property as well. If Amy fulfilled all the conditions the court set associated with remaining in the farmhouse, it certainly would benefit the trust and ultimately both beneficiaries. We find no error in the chancellor's ruling.

> IV. **Did the chancery court err in failing to require Amy to reimburse the trust for the funds she received from the cattle sales, and did the chancery court err in failing to order that Troy be reimbursed for alleged expenses incurred associated with the management of the cattle?**

¶18. Troy argues on appeal that Amy should have been ordered to reimburse the trust for cattle sale proceeds not placed in the trust account but rather placed in her personal account for her own use. Amy sold the cattle on three separate occasions: March 28, 2018; October 17, 2018; and January 9, 2019. The disposition of the proceeds from the first cattle sale is not disputed. Troy claimed that Amy did not deposit the full amount of the sale proceeds from the second sale in the trust account, and he further claimed that Amy did not deposit any of the sale proceeds from the third sale in the trust account. Amy testified at trial that she believed she had deposited the full amount of the proceeds from the second sale, but the

11

evidence at trial showed that there was a $1,500 discrepancy in the amount that was paid at the sale and the amount that was deposited in the trust account. Amy claimed that she put all the proceeds from the third sale, $2,852.92, in her personal account. According to Amy, she used the money to reimburse herself for feed, vet bills, fuel, bailing string, protein cubes, minerals, and other repairs that needed to be made around the farm. Similarly, Troy testified at trial that he also wrote checks to reimburse himself from trust funds to cover expenses from a tractor supply store and a co-op. Troy admitted that he wrote checks from trust accounts to pay multiple individuals to help him with the work that needed to be done around the farm.

¶19. Additionally, Troy argues on appeal that he should have been reimbursed for certain expenses that he incurred during an approximate seventeen-month time period while he was taking care of the cattle farm. More specifically, he argues that the chancery court erred in denying his claim for reimbursement for travel expenses from his home in Walls, Mississippi, to Batesville, Mississippi, in the amount of $6,180 after the court took judicial notice of the standard IRS mileage reimbursement rate. On the same token, Amy testified that she also commuted back and forth between her home in Memphis, Tennessee, and the farm in Batesville, Mississippi. As a result of her commuting and personal finances spent on the farm, Amy testified that she lost her Memphis home to foreclosure. It is clear to this Court that at least some of the reimbursements for which Troy requested arose out of transactions that occurred while Troy and Amy's father's estate was still open. That being said, it is unclear what actions Troy and Amy took while acting as co-executors of their

12

father's estate and which actions they took while acting as co-trustees of the Aaron Stapp Living Trust.

¶20.    In *Shelby v. White*, 158 Miss. 880, 131 So. 343, 346 (1930), the Mississippi Supreme Court stated that "when [the trustee] pays claims for the benefit of the trust estate, which he is **authorized by the trust instrument to incur**, he may be reimbursed out of the estate." (Emphasis added).  In this case, this Court is not privy to the applicable trust instruments or any of the provisions.  It is unclear to this Court whether Amy or Troy, when acting as co-trustees, had any authority granted within the trust instrument to make certain expenditures for which they requested reimbursement or for which they unilaterally reimbursed themselves without consulting the other.  Notably, even after all the expenditures for which Troy requested reimbursement, it is undisputed by the parties that the farm generated absolutely no income after their father's death.  In fact, just the opposite occurred, and cattle died under the care of the co-trustees.  Both parties admitted to reimbursing themselves for expenses they claim they made for the benefit of the farm.  Both parties also claim that they incurred traveling expenses while trying to maintain the farm.  In its ruling, the chancery court pointedly acknowledged both parties' claims and stated such in its order.  More specifically the order stated, "[B]oth parties have taken their turn at operating the farm and its cattle and hay operation.  Neither party shall be reimbursed for any expenses they claim they incurred while so operating."  Given the limited information in the record regarding the authority to make expenditures on behalf of the trust, this Court finds no error in the chancery court's decision denying Troy's request that Amy reimburse the trust for cattle-sale proceeds and

13

reimbursement for his travel expenses to and from the farm.

## CONCLUSION

¶21. We find that the chancellor's rulings are supported by substantial evidence, that he did not abuse his discretion, and that his findings were not manifestly wrong or clearly erroneous. Further, he did not apply an erroneous legal standard.

¶22. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**McCARTY, J., DISSENTING:**

¶23. The trial court modified the two trusts without having the actual terms of the trusts or knowing the settlor's intent. It was therefore manifest error to rule in the absence of the trust documents, so the only solution is to reverse and render.

¶24. Our record is missing crucial evidence—the documents creating the trusts. It should go without saying that we can only interpret, review, dissolve, or modify a trust when we have the language of it before us because, like a will, we have to do what the creator of the documents wanted. "[I]t is well known that a trust must be administered according to the intent of the settlor." *Gulf Nat'l Bank v. Sturtevant*, 511 So. 2d 936, 937 (Miss. 1987). As the Supreme Court has explained, the "administration of a trust must accord strictly with the intent of the settlor and the terms of the trust[.]" *In re Est. of Smith v. Boolos*, 204 So. 3d 291, 315 (¶58) (Miss. 2016) (quoting *Reedy v. Johnson's Est.*, 200 Miss. 205, 210-11, 26 So. 2d 685, 687 (1946)). This general rule is so strong that "ordinarily even a court of equity has

14

no authority to authorize the trustee to depart therefrom, and *will do all within its power to see that the trust is executed in accordance with its terms*[.]" *Id*. (emphasis added).

¶25. We also cannot approve a modification or dissolution of a trust when doing so would harm a beneficiary: "The interests of the beneficiaries are paramount, and *nothing should be done* that would diminish their rights *under the terms of the agreement* and granted by law." *Wilbourn v. Wilbourn*, 106 So. 3d 360, 371 (¶35) (Miss. Ct. App. 2012) (emphasis added).

¶26. For decades upon decades, our review was grounded strictly in what the trust documents *said* and in what the settlor *intended*. This case departs from our approach spanning nearly a century.

¶27. This case did not begin with a request to sell all of the cattle and farm equipment. The only relief Amy Stapp asked for in the very first filing was to remove the trustees over the Aaron Stapp Living Trust. Amy argued "the current trustees should be removed, as a lack of cooperation among the cotrustees is substantially impairing the administration of the trust." In the alternative, she alleged "that because of unfitness, unwillingness, or persistent failure of the trustees to administer the trust effectively, the court should determine that removal of the trustees best serves the interests of the beneficiaries." Amy alleged she and her brother Troy were the beneficiaries.

¶28. Yet Amy did not attach a copy of the trust documents. Without these papers, we lack crucial details regarding the intent of the settlor, such as the requirements their father set and perhaps meant to span generations.[6]

---

[6] There was at least one other possible beneficiary—Amy's daughter Alisa, who signed a waiver of her rights under the trusts. However, without the trust documents we do

¶29.   After the suit began, a lawyer was "appointed as sole Trustee for both Trusts in this action."  He was also appointed to "evaluate the propriety and potential for dissolving both Trusts pursuant to their terms."

¶30.   While this order repeatedly uses the plural form for describing the trusts—whatever they might be—it bears repeating that there are no documents in the record to fully describe *what* is contained by the trusts in terms of property—real or chattel.

¶31.   Amy then petitioned the trial court to divide the trust—singular—alleging that the Aaron Stapp Living Trust was created in 2015 and, again, that she and her brother were the only beneficiaries.

¶32.   In a counter-petition, Troy alleged that he and Amy were "the beneficiaries of the Stapp Revocable Living Trust dated December 17, 2009 and the Aaron Stapp Living Trust dated May 28, 2015[.]"  He explained the siblings were co-trustees.[7]  According to Troy, the Aaron Stapp Living Trust contained a residence in Cordova, Tennessee, which was given to Amy for her use.  Troy maintained that the trusts—plural—owned a cattle farming operation in Panola County.[8]

---

not know if there were other beneficiaries.

[7] At trial a question was posed to Troy that assumed there was "a little over a million dollars in this Trust," with another assumption that "[t]he two Trust[s] in effect have been consolidated."  But there was no actual proof of the assets or that there had been a consolidation.  Additionally, these were only statements made by a lawyer in the course of questioning an adverse witness.  Troy ultimately answered that he wanted the assets "to remain in a trust," while he wanted his sister "to have her money."

[8] It was not clear at trial how many cattle were still alive.  Troy believed there were fifty-seven, but that was just what he counted.

16

¶33. The conflicting testimony between the brother and sister and the overall vagueness in this case is concerning. Normally we have wills, deeds, trusts, or contracts, which spell out explicitly and at length what the goal of a document is, who is to benefit, what is at stake, and how long it lasts. Yet in this odd case, we know nothing of what is really possessed by the trusts, who is involved, what rights they have as determined by their father, the settlor, or any of the necessary details. What we have is a sketch, and what we are missing is the blueprint. Without a blueprint, our review is simply frustrated.

¶34. Our standard of review compels us to reverse when a "chancellor's factual findings are manifestly wrong [or] clearly erroneous," and "we review questions of law de novo." *Wilbourn*, 106 So. 3d at 370 (¶34). Under the concerning and unusual circumstances of this case, the factual findings of the trial court cannot be upheld because we have no trust documents that reveal if the judgment was appropriately guided by the settlor's intent, and the limited proof we do have does not support the division as ordered.

¶35. Two specific rulings highlight why we must reverse and render. First, the trial court set aside $50,000 after the sale of cattle and farm equipment for "unforeseen expenses, taxes[,] and insurance." Yet as Troy argues, "[t]he chancellor made no finding" of fact as to what this number was based upon "and gave no reasons for the amount of the fund." Nor does the maintenance of the $50,000 fund have an express end date, and it is unclear who may tap into it and for what reason. While "taxes and insurance" were listed, the trial court did not define what might constitute "unforeseen expenses." No other detail demonstrated how the $50,000 will be maintained or administered.

¶36.    With respect to the majority, it approves the set aside of the $50,000 without citation to law and only after concluding that the money "*seemed* to be set up for a different category of expenses outside of the day-to-day variety." *Ante* at ¶14 (emphasis added).  Yet it is unclear on what basis we could approve this new sub-account of the trusts, let alone how it will be administrated, for what purpose, to whom's benefit, or for how long.  This amount simply has no basis in the record.  It may also directly conflict with the language of the trusts at issue.  We cannot approve such a finding of fact.

¶37.    Secondly, there is no basis in the record for the trial court's refusal to refund the trusts for Amy's sales of cattle when she admitted she pocketed some of the amounts that belonged to the trusts.  She testified she only did it *because she wanted to*:

> Q:    We just discussed the proper thing to do is put [the money from the cattle sales] in the trust account.  But you decided [. . .] not to put that in the Trust account?
>
> A.    That's correct.
>
> Q.    You made this decision on your own?
>
> A.    Yes, sir.
>
> . . . .
>
> Q.    Did you have any advice from anyone to do that or was that your decision?
>
> A.    I made that on my own.
>
> Q.    Knowing the proper thing to do was to put it in the Trust account, you put it in the personal account?
>
> A.    Yes, sir.

¶38. Given Amy's admitted testimony that she sold the property of the trusts, which as far as we can tell was meant for the benefit of both her and her brother, and given that she then personally kept the money from the sale, we simply cannot affirm. Further, the trial court's denial of Troy's request for reimbursement here is not based on the record, and is therefore manifest error.[9]

¶39. Presented before us is a dispute that explicitly lacks the terms of the trusts—a situation I have never seen before. The trial court was without authority to modify these terms since by doing so, it may have violated an express desire of the settlor. We do not know, as the daughter failed to introduce the documents. The only conclusion is that the trial court's judgment did not follow the Supreme Court's mandate to interpret a trust to "accord strictly with the intent of the settlor and the terms of the trust[.]" *Est. of Smith*, 204 So. 3d at 315 (¶58) (quoting *Reedy*, 200 Miss. at 210-11, 26 So. 3d at 687)).

¶40. For these reasons, the only resolution of this appeal is to reverse and render.

---

[9] Furthermore, it is concerning that the appointed trustee was not present at trial and did not testify. This absence deprived the trial court of critical, and perhaps *jurisdictional*, information. "In disputes concerning the amount disbursed under trusts, courts are very deferential to the trustee's judgment." *Gulf Nat'l Bank*, 511 So. 2d at 937. The trustee has "the duty of complete loyalty" in the administration of a trust, and a fiduciary duty to each beneficiary. *Wilbourn*, 106 So. 3d at 370 (¶33); *Cassibry v. Cassibry*, 217 So. 3d 698, 707 (¶24) (Miss. Ct. App. 2017). The trustee in this case could have been a key source of testimony regarding the settlor's intent and how the trusts could have been modified, altered, or dissolved to best serve the interests of the two beneficiaries.

The majority correctly points out there is no proof that the trustee objected to the end result, but this does not alleviate the lack of evidence supporting the trial court's judgment.